## HALL v. WEEKS.

4-8749                              217 S. W. 2d 828

### Opinion delivered February 21, 1949.

*Reid & Roy* and *Elsijane Trimble Roy,* for appellant.

*Virgil R. Greene,* for appellee.

GRIFFIN SMITH, Chief Justice.   July 27, 1945, J. C. Weeks delivered to Dean Adams as payee his $4,000 check.   It was drawn on an Alabama bank and contained the frontal notation, "Earnest Money on Twentieth Century Tourist Court."   The reference is to a contract negotiated through Adams as agent by which Webber Hall of West Memphis, as owner of the Tourist Court, was to

invest Weeks with title for $40,000, half cash and half to be represented by a series of $300 notes payable monthly.

Adams deposited the check in a Memphis bank to an "earnest money" account and the bank in due course caused it to be presented to the payer. In the meantime Weeks, with notice to Adams and Hall, directed the bank to dishonor.

In August 1946 Adams assigned to Hall, for a valuable consideration, his interest in the check, together with any cause of action he might have against Weeks. Hall sued, naming Weeks and Weeks' wife, and Adams, as defendants. The complaint alleged that when the contract was made Weeks owned 160 acres of Mississippi County land, but in an effort to prevent collection of any judgment that might be rendered against him, Weeks. had fraudulently conveyed the land to his wife, as evidenced by deed of August 13, 1945. There was a prayer for attachment, with *lis pendens* notice.

Weeks and his wife, in answering, denied that the August conveyance was fraudulent. Response was made to certain interrogatories, an admission being that the acreage conveyed to Mrs. Weeks was the only property the defendant owned in Arkansas. Treating the contract of July 27 as incomplete, Weeks alleged that Hall, before meeting certain conditions precedent, attempted to "convert" the check, the motive being to "prompt" the maker to stop payment, with the corrupt intent of retaining the proceeds. It was further alleged that Hall, while in default respecting contractual duties, entered into negotiations with others for sale of the property, and on September 15, 1945, actually disposed of it for $45,500. Specifically, it was pleaded that Hall's failure to tender a deed and abstract of title created a situation excusing Weeks from completing the purchase.

*First—Terms of the Contract.*—Express terms of the agreement were that $4,000 should be earnest money "and in part payment." A recital applicable to Hall was, "I have sold and agree to convey." Notes were to

be on the basis of four and a half percent, interest included in monthly installments of $300. The cash balance of $16,000 was payable with delivery of deed and evidence of marketable title. Thirty days were allowed for examination of the abstract after its prompt delivery. The seller had a right, in the event of objections, to furnish a guarantee of title executed by the Commerce Title Guaranty Co., or Union Planters Title Guaranty. Provision was made for payment of taxes. There was this stipulation: ''But if the title is good and the property not paid for as herein specified, this earnest money [evidenced by check for $4,000] is to be forfeited to the seller and divided equally between the seller and Dean Adams.''

It will readily be seen that all details essential to the contract were included in the writing.

*Second—Conduct of the Parties.*—Inference to be drawn from counsel's answer for Weeks is that the check was prematurely presented for payment with a two-fold fraudulent purpose. First, the act was to ''provoke'' Weeks to stop payment. Second, in the absence of mutual contemplation that the check would be cashed, premature deposit amounted to conversion, hence Hall planned to appropriate the money.

Evidence in support of these contentions does not reach the dignity of serious argument. Weeks testified that when the contract was made he had ''plenty of money and property with which to pay his debts.'' He had formerly been in business; but, being unoccupied during July 1945 he made a trip that took him to West Memphis, where for several days he was registered at Twentieth Century Courts. Personal inspection of the property suggested its desirability. The inclination to buy was influenced by evidence of good patronage. Preliminary discussions brought an offer from Hall to sell for $45,000. When Adams' organization became a factor the realtor was represented by R. M. Welch as salesman. Welch conducted the negotiations resulting in Weeks' final agreement to buy for $40,000.

Welch testified that with completion of the contract he returned to Memphis and on behalf of Adams and Hall the check was deposited in a special "earnest money" account. Proceeds were to be retained until the deal had been consummated. July 29th Weeks called by telephone, explaining that he intended, after returning to Birmingham, to dispose of some property there, but a strike prevented newspapers from accepting his advertisements.

Weeks, when asked what caused him to "repudiate" the check, testified: "There were several causes. First, after signing the contract I looked over the property. There were several things I hadn't seen at first that didn't particularly please me. Another thing, after returning to my home at Birmingham [I was told by my doctor that] he didn't think the climate there would do me any good. Another thing: To go through with the contract at that time would force me to dispose of some Birmingham real estate, and [because of the strike] you couldn't advertise." Without disposing of the property —sale of which would be "prolonged" for want of adequate advertising facilities—Weeks was unable to meet terms of the contract, ". . . so these three reasons were the motive in turning it down."

In answering questions relating to the check, Weeks said it was deposited with his "consent and permission." Pertinent statements were: Hall had not asked that the deal be "called off"; bad health was the principal reason for attempting to rescind; neither a deed nor abstract was wanted; as far as Weeks knew the title was not defective. Nowhere is there support for the original assertion that the check was prematurely deposited, or that it was handled in a manner contrary to intentions of the parties, or that Hall's delay in supplying an abstract and tendering a deed influenced Weeks' determination to abandon.

*Third—Penalty, or Liquidated Damages?* — That part of the contract affecting the check is a printed form, concluding with an acknowledgment by Welch as agent

that the earnest money had been received. Should the buyer default it would "forfeit" to the seller.

Appellee correctly says that when, as here, words are selected by the proponent of a contract, and the phraseology does not convey a clear meaning, uncertainties will be resolved against the one whose form was used if the language is reasonably susceptible of the particular construction. Contemporaneous understanding of the parties is highly persuasive. *Stevens* v. *Cherry Hill Special School District No. 10,* 206 Ark. 832, 177 S. W. 2d 722.

Testimony by Weeks is conclusive that the check was to be cleared and proceeds credited on the down payment of $20,000. Although this deposit would be *forfeited* by Weeks if his commitments were repudiated, the same sentence gives Adams and Hall equal participation. True, there is no express declaration that abandonment by Weeks will cause an actual loss of the sum involved. Still, the payment was set aside as a guarantee that Weeks in all earnestness would proceed with the purchase. Circumstances indicate that ten percent of the capital obligation was thought to be appropriated to ·compensate damage for the delay, inconvenience, uncertainty, and actual expense. Nor is the situation materially changed because within five or six weeks Hall sold for $45,500. Weeks had at that time definitely withdrawn, with an offer· to reëvaluate at his arbitrary figure of $250.

The general rule governing liquidated . damages is that an agreement in advance of breach will be enforced if the sum named is a reasonable forecast of just compensation for the injury, if the harm is difficult or incapable of accurate estimation. Restatement of Contracts, Ch. 12, Sec. 339. A comment is that where, instead of promising to pay a fixed sum for breach, the promisor deposits money with the promisee or a third party as security for performance of the promise, and to be forfeited in case of breach, this deposit may be either a penalty or liquidated damages.

We think the uncertain nature of the risk taken by Hall in binding himself to sell, at a price satisfactory to

Weeks, justifies a construction that each recognized that a substantial loss might flow from failure of the buyer to perform, hence $4,000 was the sum mutually fixed.

*Fourth—Weeks' Deed to His Wife.*—Weeks' deed to his wife was executed the day appellant's attorney sent a telegram stating, in effect, that suit would be filed. Admittedly the land belonged to Weeks. The conveyance was fraudulently conceived. It was the only property he had in Arkansas, and it was not bought with the wife's money. Weeks testified that because of ill health he wanted the title to be in his wife. This, however, could not defeat the rights of a prior creditor. *Farmers State Bank* v. *Foshee,* 170 Ark. 445, 280 S. W. 380.

The decree is reversed, with judgment here on the check. The cause is remanded with directions to avoid the deed in so far as appellant's rights are concerned, and to proceed in a manner not inconsistent with this opinion.

HOLT, J., dissenting. The real estate sales contract involved here called for a down payment in gross of $4,000 as earnest money and contained this additional provision: ". . . if the title is good and the property not paid for as herein specified, this earnest money is to be forfeited to the seller . . . ."

The primary and decisive question presented, as I read the record, is whether this $4,000 was intended, in the circumstances, as a penalty or liquidated damages.

I think under the plain terms of the contract and the meaning of the words used, a penalty, in effect, and not liquidated damages, was provided for by the parties. We only interpret contracts, not make them. If it could be said that some doubt was created by the use of the word "forfeiture," then, of course, under our well established rule "a contract will be construed as unfavorably as its terms will admit against the party who proposed and prepared it." (Headnote 1), *Leslie* v. *Bell,* 73 Ark. 338, 84 S. W. 491.

It is conceded here that appellant prepared the contract.

Webster defines "forfeiture" as "breach of condition, . . . that which is forfeited; a penalty," and as synonymous with penalty.

In Bouvier's Law Dictionary, Rawle's Third Revision, Vol. 2, we find this language: "A provision in an agreement, that for its breach the party shall 'forfeit' a fixed sum, implies a penalty, not liquidated damages; *Salters* v. *Ralph,* 15 Abb. Pr. (N. Y.) 273;" and in the cited case, the Supreme Court of New York said: "The stipulation here is for a forfeiture. If this is to be deemed stipulated damages, then there has certainly been a great revulsion in the law on this subject; for, instead of its being any longer difficult to frame a clause which shall have the effect of liquidating damages, it will have become difficult to frame a clause which shall not have that effect. In *Bagley* v. *Peddie,* 16 N. Y. 469, 69 Am. Dec. 731, it is laid down as one of the rules for determining whether a given clause liquidates the damages, that 'where the word penalty is used, it is generally conclusive against its (the clause) being held liquidated damages, however strong the language of other parts of the instrument in favor of such construction.' Now, the case at bar falls directly within this rule. True, the word 'penalty' is not used, but the word 'forfeit,' which has the same legal effect, is; and it is through the single word 'forfeit' only, that plaintiff can make any claim whatever to the $250. There is nothing in the language of the other parts of the instrument which in the slightest degree favors the construction that this sum was intended to be agreed on as ascertained and liquidated damages."

Here a gross sum of $4,000, as a forfeiture or penalty, was stipulated. Appellant never surrendered possession of the property in question and received all income until he sold it at a profit of approximately $5,000 over and above the selling price to appellees.

Had appellant intended that the gross sum of $4,000 stipulated was intended as liquidated damages, and not

as a forfeiture or penalty, it would have been so easy to have removed any doubt by so stating in plain English in the contract. This he did not do, and as pointed out, we must construe the contract as unfavorably against appellant as its terms will admit.

This court, speaking through Judge MANSFIELD, in *Nilson* v. *Jonesboro,* 57 Ark. 168, 20 S. W. 1093, said: "The authorities, however, show that where the intention to liquidate the damages is not obvious, the stipulated sum will usually be given the effect of a penalty if it exceeds the measure of a just compensation and the actual damage sustained is capable of proof," and in *Huntington* v. *Attrill,* 146 U. S. 657, 13 S. Ct. 224, 36 L. Ed. 1123, the court said: "In the words of Chief Justice MARSHALL: 'In general, a sum of money in gross, to be paid for the non-performance of an agreement, is considered as a penalty, the legal operation of which is to cover the damages which the party, in whose favor the stipulation is made, may have sustained from the breach of contract by the opposite party.' *Tayloe* v. *Sandiford,* 7 Wheat. 13, 17, 5 L. Ed. 384."

I think, therefore, that the decree should be affirmed. Certainly it seems to me we cannot say that the trial court acted against the preponderance of the testimony.