SMITH *v.* DIXON.

5-3432 386 S. W. 2d 244

Opinion delivered February 1, 1965.

*William H. Drew,* for appellant.

*Ovid T. Switzer* and *W. P. Switzer,* for appellee.

FRANK HOLT, Associate Justice. The appellee, as purchaser, brought this action against appellants, as sellers, for the specific performance of a contract for the sale of realty and in the alternative sought damages for nonperformance of the contract.

The appellants are E. F. Smith, his wife, and their children and spouses. This entire family constitutes a business firm known as E. F. Smith & Sons, A Partner-

ship. The "Contract For Sale Of Realty With Lease" was signed by one of the appellants, W. R. Smith, on behalf of the family partnership.

By the terms of the contract, executed in March 1962, the partnership agreed to sell the 750 acre "Cracraft" plantation for $200,000.00 and convey title to the appellee on January 3, 1963. In the interim, by the lease provisions, the appellee took possession, farmed, and improved a portion of the property. Upon refusal of the appellants to convey the land as recited in the contract, the appellee instituted this action. The chancellor denied specific performance and awarded appellee special damages in the amount of $11,512.73.

On appeal the appellants contend that the contract "prepared for signature of all owners, their wives, and the escrow agent, was never executed by the intended parties and, therefore, no obligation was incurred thereunder" and, further, the contract was never ratified by the owners of the land. The contract was signed "E. F. Smith & Sons, a partnership By: W. R. Smith" and also by the appellee, "W. T. Dixon". Appellee's attorney, who drafted the contract, prepared an extra page for the signatures of the other members of the family constituting the partnership. However, the appellee recorded the instrument without ever requiring the additional signatures. Appellants argue that the contract is not enforceable against the partnership because the record title is in the name of the individual members of the family as tenants-in-common. In other words, the title has never been transferred from individual family ownership to the partnership. We find no merit in this contention as did the chancellor.

The partnership was created a short time after the lands in controversy were acquired by the family in 1951. The court found that:

"Soon after the purchase of 'Cracraft' [the lands in question] and the 'Sterling Place,' the Smiths, at the suggestion and on the recommendation of the financial institutions, who were to finance the farming operations

for them on the farms, organized and formed a partnership known as E. F. Smith & Sons. They term the partnership an 'operating partnership'. The general purpose of the firm was to engage in farming operations on the farms, including direct cultivation and renting to others. The operation was later expanded to engage in the general farming business in the area. The partnership agreement was oral and has never been reduced to writing. Mr. W. R. Smith is the predominent member of both the partnership and the Smiths. He serves as the managing partner with general powers, with Mr. Charles Smith in charge of production. The other members of the partnership did not, nor at the present time, appear to have any direct participation or responsibility in the operation.

8. The association of Smith and Sons with the land: Smith and Sons assumed possession of the land after the formation of the partnership and have been in exclusive possession ever since. The firm has no lease, either written or verbal with the Smiths. It does not pay any rental, as such, for the use of the land, to the record owners. The firm cultivates a portion of the land and rents the remainder to others. It collects the income and rentals from the land. The firm mortgages the crops and rentals for operating purposes. It pays the taxes, insurance and upkeep on the property. The firm pays the installments on the mortgage loan. The U. S. Department of Agriculture contract is in the firm name.

The firm, by and through its managing partner, Mr. W. R. Smith, has acted as agent for, or under contract with, the Smiths in the sale of the 'Sterling Place' to Mr. Rankin, in a similar capacity in another land conveyance and as trustee for another purchase.''

It appears undisputed that appellant W. R. Smith was authorized by the members of the partnership to negotiate for the sale of the lands in question to the appellee. However, it is claimed that his authorization was based upon different terms of sale, mainly, a price of $225,000.00 instead of $200,000.00. Therefore, it is

urged that the contract is unenforceable since it was not signed nor ratified by other members of the family.

In the case of *May* v. *Ewan*, 169 Ark. 512, 275 S. W. 754, we held that a partnership is bound by the acts of a partner when he acts within the scope or *apparent* scope of his authority. There we quoted with approval:

" * * * In order to determine the apparent scope of the authority of a partner, recourse may frequently be had to past transactions indicating a custom or course of dealing peculiar to the firm in question."

See, also, Ark. Stats. Ann. § 65-108—110 (Repl. 1957). In the case at bar it was customary in past transactions, as in the present one, for the partnership to rely upon the co-partner, W. R. Smith, to transact the business affairs of the firm. We agree with the chancellor that appellant W. R. Smith was acting within the apparent scope of his authority as a partner when he signed the contract and that it is binding and enforceable upon the partnership.

Appellants also urge that the contract is invalid because the bank as escrow agent did not sign the contract and the appellee did not comply with the escrow provisions of the contract. A copy of the contract was delivered to the Eudora Bank where appellee's certificate of deposit in the amount of $15,000.00 was held with the knowledge of the escrow provisions. The contract provided for the bank to hold $15,000.00 in escrow to guarantee appellee's performance of the contract. We agree with the chancellor that there was substantial compliance with the escrow provisions of the contract.

Appellants next urge that a suit for specific performance, or in the alternative, damages, is an inconsistent remedy and, therefore, in seeking specific performance the alternative claim "for damages is a nullity". We find no merit in this contention. The contract specifically provided for liquidated damages in the sum of $15,000.00 in the event of breach by either party. Furthermore, in the very recent case of *Loveless* v. *Diehl*,

236 Ark. 129, 364 S. W. 2d 317, we recognized that even though no such specific provision for stipulated damages appears, it is within the discretion of the chancellor to award damages where specific performance of the contract is denied. See, also, 81 C.J.S. Specific Performance § 163, pp. 778 and 782.

The appellants also urge for reversal that the contract lacked mutuality and, therefore, was not binding. Appellants contend that appellee was never bound by the contract since by its terms appellee had the right to rescind upon appellants' failure to meet the express warranty that a 225 acre allotment went with the land. It later developed the allotment actually amounted to 178.3 acres, or 46.7 acres less than the amount warranted in the instrument itself. Therefore, appellants argue that the contract lacked mutuality since it was optional with the appellee as to whether or not he would require performance of the contract or invoke the provision for stipulated damages. The appellee had the right to accept such reduced acreage which he offered to do. We think such an option did not render the contract lacking in mutuality. *Bonner* v. *Little*, 38 Ark. 397; *Braley* v. *Arkhola Sand & Gravel Co.*, 203 Ark. 894, 159 S. W. 2d 449; 92 C.J.S. Vendor & Purchaser § 216, p. 78.

The contract also provided that if appellants could not transfer the rice allotment to their other lands they could not be required to convey the lands. When the contract was entered into, the appellant, W. R. Smith, maintained that the rice allotment could be transferred to other lands. It developed that the rice allotment could not be assigned or otherwise transferred to any other farm due to existing federal regulations. The fact that the rice allotment could not as a matter of law be transferred was not the fault of the appellee and should not affect the validity of this contract. Appropriate to the case at bar, we find in 17A C.J.S. Contracts § 463 (1) p. 611, the following:

"Where a party enters into a contract knowing that permission of government officers will be required dur-

ing the course of performance, the fact that such permission is not forthcoming when required does not constitute an excuse for nonperformance.''

Appellants' final contention is that the chancellor's award of $11,512.73 to the appellee as special or actual damages is not sustained by the pleadings or the proof. The appellee, on cross-appeal, contends that he is also entitled to stipulated damages. The appellee sued for $15,000.00 stipulated damages as recited in the contract and also sought the further sum of $8,981.23 for permanent improvements he had made on the ''Cracraft'' farm as a lessee in anticipation of acquiring title. The trial court denied liquidated damages and instead awarded appellee $11,512.73 actual damages. The chancellor refused to apply the contract provision for $15,000.00 stipulated damages since he construed such as a penalty. After hearing considerable testimony on the subject of special damages, the court deemed it necessary to hold an additional hearing in an effort to determine with more exactness appellee's expenses or the damages he had incurred as lessee in the draining, improving, and ridding the land of weeds and grasses. After the latter hearing, the chancellor stated that:

''\* \* \* if it were not for the element of surprise, which probably both parties could claim, the court would reconsider its finding on stipulated damages, vacate same and find that such damages stipulated in the contract should prevail over actual damages.''

Thus, it is apparent that the ascertainment of special or actual damages was a vexing problem, difficult and fraught with uncertainty. The stipulated damage provision for a breach of the contract on the part of appellants reads in pertinent part:

''It is hereby expressly agreed between the parties hereto that in the event this contract shall fail due to a material breach on the part of Seller because of inability to convey good title \* \* \* or, inability to convey \* \* \* minimum cotton acreage allotment, \* \* \* or, should Seller elect to refuse to convey because of inability to transfer

the rice acreage from this land to other lands owned by Seller, then Purchaser's damages are agreed hereby to be the sum of Fifteen Thousand and No/100 Dollars ($15,000.00), plus the costs, apportioned to either or both of the above improvements, whichever might have been located on the premises by Purchaser, and such damages, including the cost of the above mentioned improvements, shall be deemed liquidated * * *."

The "above mentioned improvements" referred to the right of appellee to move his house and also build an equipment shed upon the lands, neither of which was ever done.

In *Hall* v. *Weeks*, 214 Ark. 703, 217 S. W. 2d 828, we said:

"The general rule governing liquidated damages is that an agreement in advance of breach will be enforced if the sum named is a reasonable forecast of just compensation for the injury, if the harm is difficult or incapable of accurate estimation. Restatement of Contracts, Chapter 12, § 339."

See, also, *Foran* v. *Wisconsin & Arkansas Lbr. Co.*, 156 Ark. 346, 246 S. W. 848; *Robbins* v. *Plant*, 174 Ark. 639, 297 S. W. 1027; *Westbay* v. *Terry*, 83 Ark. 144, 103 S. W. 160; 25 C.J.S. Damages § 116, p. 702.

In the case at bar the stipulated damages of $15,000.00 amount to only 7½% of the purchase price in the contract, while in *Hall* v. *Weeks, supra,* it amounted to 10%. We do not construe this amount as a penalty, even though it appears that the provision for stipulated damages resulted to some extent from a "race horse contest" as an outgrowth of appellants' insistence and the appellee's dubiousness that the rice allotment could be moved from the "Cracraft" farm to other lands owned by appellants. Instead of a penalty, we find there is a reasonable relation between the amount of the stipulated damages and the agreed purchase price of $200,-000.00. Further, the chancellor found that the value of the rice allotment which could not be transferred had

a minimum value of $18,000.00 which, of course, is in excess of the $15,000.00 stipulated damages. We do not consider this amount of stipulated damages as being extravagant or disproportionate to the losses suffered by the appellee in the case at bar. Also, the appellee was equally liable for $15,000.00 stipulated damages for nonperformance on his part.

Therefore, we think the stipulated damages provision in the contract should prevail over any assessment of actual damages. Accordingly, the decree is affirmed on direct appeal and modified and remanded on cross-appeal with directions for entry of a decree disallowing special damages and awarding the stipulated damages.