## G. B. CHRISTMAS et al *v.* Mary Shelton RALEY et al and MURPHY OIL CORPORATION et al

75-377                                          539 S.W. 2d 405

### Opinion delivered July 6, 1976
[Rehearing denied September 13, 1976.]

*Keith, Clegg & Eckert,* by: *Oliver M. Clegg* and *Ned A. Stewart Jr.,* for appellants.

*Smith, Stroud, McClerkin, Conway & Dunn,* by: *Hayes McClerkin,* for appellees and intervenor-appellees.

ELSIJANE T. ROY, Justice. Appellees Mary Shelton Raley, et al. and intervenor-appellees (intervenors) Murphy Oil Corporation and American Petrofina Company of Texas (Petrofina) sought a declaratory judgment that two oil fields, unitized on a field-wide basis by order of the Arkansas Oil and Gas Commission (Commission), consonant with Ark. Stat. Ann. §§ 53-115(c)(1) et seq., had terminated as units. Appellees and intervenors requested an order cancelling as clouds on their title the oil and gas leases upon which the units were created.

Appellees are the owners and lessors of the mineral acreage in the units here involved, known as the Genoa and

Genoa-Tokio Units. Intervenors are lessees of this mineral acreage who acquired their leases in 1973 and 1974 subsequent to creation of the units by the Commission. Appellants G. B. Christmas et al. are either lessees or the assigns of lessees of the acreage upon which the units are based, and had acquired the original mineral leases to the land. The Genoa Unit was created by the Commission on February 16, 1962, and the Genoa-Tokio Unit on October 17, 1963. Both fields are devoted to the extraction of hydrocarbon compounds by a water injection secondary recovery technique and both may, for practical purposes, be treated as one field.

Concurrently with the creation of the units by the Commission agreements were drafted which stipulated the rights of the respective parties in relation to the unit operations. Appellees and intervenors rely upon Article 18.1 of the unit agreements (UA) to support their termination claims. It provides:

> The term of this agreement shall be for the time that Unitized Substances are produced in paying quantities and as long thereafer as Unit Operations are conducted without a cessation of more than ninety (90) consecutive days, unless sooner terminated by Working Interest Owners in the manner herein provided.

Appellants denied that the units and/or the leases on which the units were based terminated; questioned the chancellor's jurisdiction to act in this case; pled estoppel, waiver, laches and limitations; affirmatively sought an order cancelling the leases of intervenors as clouds on their title to the unit and sought damages against both groups for disturbing their peaceful possession of the units.

The chancellor held that the Genoa-Tokio Unit was terminated on November 1, 1967; that the Genoa Unit was terminated on April 1, 1973; that the leases were terminated on April 1, 1973; that jurisdiction was present. He granted the cancellation order sought by appellees and intervenors removing the cloud on their titles. He denied the cancellation order sought by appellants and also denied the damages sought by appellants. From the rulings adverse to them appellants have appealed.

Appellants first urge that the chancellor lacked jurisdiction, contending that jurisdiction was exclusively in the Commission. We find no merit in this contention. The nature of the relief requested by appellees and intervenors was in the main equitable in nature.

In *Spartan Drilling Company v. Bull,* 221 Ark. 168, 252 S.W. 2d 408 (1952), the issue of chancery jurisdiction was raised, and we held:

> . . . [T]hat the jurisdiction granted to the Oil and Gas Commission in its supervisory capacity over oil and gas production is not exclusive, and that appellees had the right to maintain the instant suit.

We also stated in *Spartan:*

> It is not infrequent that a dual remedy, one in the judicial and another in the administrative forum, may be available to the same party for the enforcement of the same right. 42 Am. Jur., Public Administrative Law, § 252.

Furthermore, appellants waived any objection to chancery court jurisdiction by affirmatively seeking relief, i.e. cancellation of the leases of the intervenors and damages from both appellees and intervenors. See *Nichols* v. *Lea,* 216 Ark. 388, 225 S.W. 2d 684 (1950).

Appellants also contend that the chancellor erred in holding that the Genoa Unit[1] terminated on April 1, 1973, and in holding that the leases on which the unit was based likewise terminated on April 1, 1973.

It is the duty of the court to construe a contract according to its unambiguous language without enlarging or extending its term. *New York Life Insurance Company* v. *Dandridge,* 202 Ark. 112, 149 S.W. 2d 45 (1941); *American National In-*

---

[1]Appellants' brief states ". . . considering the rather small size of the Genoa-Tokio Unit in relation to the Genoa Unit, Appellants will devote no time in this Brief to the Genoa-Tokio Unit as a Unit separate and apart from the Genoa Unit."

*surance Company* v. *Hamilton*, 192 Ark. 765, 94 S.W. 2d 710 (1936).

In addition thereto, the contract must be construed against the party who had same drafted, in this instance appellant Christmas. *Yellow Cab Company of Texarkana* v. *Texarkana Municipal Airport*, 230 Ark. 401, 322 S.W. 2d 688 (1959); *W. T. Rawleigh Company* v. *Wilkes*, 197 Ark. 6, 121 S.W. 2d 886 (1938). In light of these authorities we review the record herein.

The Commission's records indicate that water commenced being injected into the Paluxy Formation, Young Sand, Genoa Unit in the month of July, 1962, and that by September of 1963 maximum production had been obtained from the unit which was in excess of 25,000 barrels of oil per month. From June of 1968, the production records indicate a sharp decline in production from the unit. Commencing in June of 1968, there was no production for a period of nine months, in 1969 very little production. Since December, 1971, no water has been injected into the formation and from June 1972, through May of 1973, there was no production from the Genoa Unit.

Landowners holding approximately 600 acres of the mineral ownership of the units testified as to the present status of the various wells indicating little or no production on their property for approximately the last five years. The following testimony is illustrative of that found throughout the extensive record of the trial.

School officials of Genoa Central School District testified that none of their wells had been operative for several years and that there had been *a period of five years in which they have received no royalty payments.* The testimony of Mr. and Mrs. Bassett clearly indicates there *had been no production under their leases since the year 1971.* The testimony of Cole Young indicated there *had been no production on* his property since 1971, and for this reason and others he had attempted to notify Christmas to vacate the premises and had contacted an attorney and the Commission regarding termination of his lease. The Commission advised him that it could not do anything about it — that he would have to go to court.

An expert independent consulting engineer, Tom G. Calhoun II, testified that production in paying quantities in the Genoa Unit ceased in June, 1968. Calhoun's testimony further reflected that initially the Genoa Unit water flood project was successful but that its economic life ended in 1968; though resumed to a limited extent in the latter part of 1969, operations were not profitable after the 1968 date. His expert opinion was that due to the nature of the Paluxy Formation, the Genoa Field can no longer be operated as a water flood secondary recovery program. Since the testimony of Mr. Calhoun is unrefuted, his testimony must be given strong weight by the court. *Blair* v. *Clear Creek Oil and Gas Company*, 148 Ark. 301, 230 S.W. 286 (1921).

Jack Denson, petroleum engineer for Petrofina, testified that the Genoa Unit was not capable of a secondary recovery program as it existed in March, 1975.

The unrefuted testimony is that production in "paying quantities" from the Genoa Unit ceased in 1968 and that subsequent thereto there have been two periods of cessation well in excess of "ninety days." The Commission's records of the Genoa-Tokio Unit indicate that a period of approximately six years existed in which there was no production of unitized substances from the unit.

There was no evidence introduced which would show that the non-production is temporary; nor is there any evidence to indicate that Christmas, as the operator of the unit, was using reasonable diligence to maintain production in the units, or in connection with any individual lease. The lessors are being injured substantially, and it must be presumed from the facts and circumstances presented at trial and contained within the record that the lessee abandoned the units and the individual leases during the periods of non-production.

A lessee must act for the mutual benefit of both lessor and lessee; *Smart* v. *Crow*, 220 Ark. 141, 246 S.W. 2d 432 (1952); *Ezzell* v. *Oil Associates, Inc.*, 180 Ark. 802, 22 S.W. 2d 1015 (1930); and if such is not evident, the involved leases should be cancelled.

156

The UA also contains the following language in paragraph 3.5:

> Nothing herein shall be construed to result in the transfer of title to the Oil and Gas rights by any party hereto to any other party or to Unit Operator. *The intention is to provide for the cooperative development and operation of the Tracts and for the sharing of Unitized substances as herein provided.* (Italics supplied.)

Consequently an analogy can be made with the implied covenant to develop as it applies to oil and gas leases. We recognized the implied covenant to develop in *Ezzell* v. *Oil Associates, Inc., supra.* In *Zappia* v. *Garner,* 259 Ark. 794, 536 S.W. 2d 714 (1976), we quoted from *Miller* v. *Mauney,* 150 Ark. 161, 234 S.W. 498 (1921), as follows:

> . . . In the construction of mineral leases such as is involved in this case, the authorities uniformly hold that there is an implied obligation on the part of the lessee to proceed with the search and also with the development of the land with reasonable diligence according to the usual course of such business, and that a failure to do so amounts in effect to an abandonment and works a forfeiture of the lease.

> . . .

> . . . The reason for the rule is that where the lessor receives as royalty or rental a certain percentage of the output of the lands as his only compensation for their use by the lessee for exploration and development, when such work ceases, his compensation ends, and the consideration for the lease fails.

The purpose of the execution of the UA is clearly set forth; the obligation created by the UA was for secondary recovery through the injection of water; and, in this instance, the operator and majority owner of the units involved ceased injecting water into the formation comprising the Genoa Unit in December, 1971, and in the formation comprising the Genoa-Tokio Unit some time during the year 1967.

Appellants also argue that:

They are entitled as a matter of law to have this Court assume that in holding the Unit did not terminate prior to April 1, 1973, the Chancellor, for sound legal reasons, concluded that Article 18.1 did not operate so as to terminate the Unit prior to April 1, 1973. And to the extent Article 18.1 did not operate so as to terminate the Unit prior to April 1, 1973, it could not have operated so as to terminate the Unit on April 1, 1973. * * *

Absent Article 18.1 to justify the Chancellor's April 1, 1973, Unit termination date, there is nothing in this record, legal or factual, to justify Unit termination on this date. This renders the Chancellor's decision in this regard arbitrary and it cannot stand.

We find no merit whatever in this contention. The foregoing legal authorities and evidence from the record amply support the finding of the chancellor that the units and the leases terminated under the terms of Article 18.1 of the UA and also under the implied covenant to develop contained in Article 3.5 of the UA. Appellants are in no position to complain because under the facts the chancellor could have determined the date of termination as prior to April 1, 1973. This date was the end of an eleven-month period with no production. Appellants have not been prejudiced by the April 1, 1973 date in that they had the opportunity for potential use of the leases a longer period of time than would have been possible if the chancellor had determined the leases terminated at an earlier date.

Appellants contend the action of appellee Young in barring appellant Christmas from entering on the property estops him from claiming unit termination.

Cole Young testified that when he moved on the property in 1969 the inefficient operations of appellant Christmas had practically ruined the land. Among the things he complained of in a registered letter to Christmas[2] are the

---

[2]The letter, dated March 27, 1972, went unanswered for approximately a year.

following: The condition of the pipe being used looked like a sifter there were so many holes, causing it to leak excessively; timber land was destroyed; slush pits had formed; cable, pipe and equipment were scattered all over the property.

Young denied ever barring Christmas' entry, but stated he advised him that he wanted his place cleaned up before operations were resumed. The chancellor heard the testimony and resolved this issue adversely to appellants. We cannot say his determination is against the preponderance of the evidence.

Appellants also urge that appellees and intervenors were precluded from making leases adverse to the Unit Operators. The gist of this argument is that intervenor Petrofina discovered the Day's Creek Field in midsummer of 1972. Thereafter it commenced subsurface studies in the vicinity of the Genoa Unit. According to its geologist, Bob B. Davis, in July or August of 1973 the company decided to extend its seismic work through the Genoa Unit to tie its "shot line" to an abandoned well drilled some years before by Carter Oil Company.

With this in mind permission of appellant Christmas was obtained to cross the Genoa Field Unit. According to Davis, permission was received from appellant Christmas, as Unit Operator, on the condition that Christmas would be furnished with a copy of the information obtained. This information was not furnished as promptly as Christmas thought it should have been and since the property had been entered with his permission appellants contend appellees and intervenors were estopped from making leases adverse to the Unit Owners.

A party claiming estoppel must prove it strictly, and facts constituting an alleged estoppel cannot arise through argument or inference as nothing can be supplied by intendment. *Ford Motor Credit Company* v. *The Exchange Bank & Trust Company,* 251 Ark. 881, 476 S.W. 2d 208 (1972).

Further, a party claiming estoppel must prove he has relied in good faith on wrongful conduct and has changed his position to his detriment. *American Casualty Co.* v. *Hambleton,*

233 Ark. 942, 349 S.W. 2d 664 (1961). The record is bare of any conduct on the part of appellees and/or intervenors which caused appellants to change their position to their detriment. The alleged acts relied on by appellants to give rise to the doctrine of estoppel occurred from August 1973 through March 1974, four months or more after April 1, 1973, the date the trial court determined that appellants' legal interest in the units and the leases that comprise same had terminated. Estoppel may be urged for the protection of a right, but it can never create a right. Appellants manifest an interest in the leases which was not apparent during the period they enjoyed the exclusive leasehold rights, and they cannot now be heard to complain of intervenors acquiring the same interest, since appellants' inaction resulted in termination of their leases.

Appellants contend the court erred in excluding the deposition testimony of Frank B. Aumiller, an independent lease broker employed by Petrofina to acquire oil and gas leases in Miller County. The objections to admission were that at trial no evidence was introduced as to Aumiller's out-of-state residence and further that appellants made no effort to have a subpoena issued for the deponent's attendance at trial. Since the parties stipulated that Aumiller was from Mississippi there appears to be merit in this contention of appellants. However, no showing of prejudice resulted from the exclusion of the testimony, since Aumiller's testimony dealt only with the issue of damages and the action complained of took place well after the time the leases terminated. Error without prejudice is not grounds for reversal. *Bridges v. Arkansas Motor Coaches, Ltd., Inc.*, 256 Ark. 1054, 511 S.W. 2d 651 (1974).

Appellants further advance as error the chancellor's denial of their request for damages against appellees Young and Albert Bassett[3] and intervenor Petrofina[4] because of Young's refusal to allow Christmas to continue operations on his property. We have previously discussed the alleged refusal of Young.

[3]Bassett in conjunction with Young allegedly impeded Christmas's operations on the Young property.

[4]Petrofina acquired a lease from Young on the property in October, 1973.

The burden of proving damages is on the party claiming damages. *St. Louis, Iron Mountain & Southern Railway Co. v. Saunders,* 85 Ark. 111, 107 S.W. 194 (1908). Appellants seek to use the testimony of appellees' witness, Jack Denson, to prove their damages. Denson testified that in his opinion it would cost $209,450 to return the central water injection plant to operating condition. The testimony of several witnesses indicates that the salt water injection pumping station had not been used since 1971. Young's testimony indicates that in 1969 when Young moved on the property the problem existed. The preponderance of the evidence indicates this condition was caused by lack of maintenance by Christmas or his employees, and so there could be no resulting liability against Young, Bassett or Petrofina.

One seeking to recover damages from the alleged wrongful conduct of another must prove not only the wrongful conduct but also that the alleged wrongful conduct caused the injury. *Jonesboro Coca-Cola Bottling Company v. Young,* 198 Ark. 1032, 132 S.W. 2d 382 (1939). There is a lack of causal connection between the acts complained of and the damages sought by appellants.

Furthermore, there must be proper proof of the damages sustained, otherwise no damages can be awarded. The evidence of damages must be such as to allow findings from established facts and not by conjecture. *Missouri & Arkansas Railway Company v. Treece,* 210 Ark. 63, 194 S.W. 2d 203 (1946). Damages herein were not proved with the required degree of specificity, and appellants failed to carry the burden of showing that the alleged wrongful conduct caused the injury.

The chancellor's decree is affirmed.[5]

---

[5]On motion of appellants the court on May 9 dismissed with prejudice appellants' counterclaim for damages against Murphy Oil Corporation.