## ARKANSAS PUBLIC SERVICE COMMISSION v. YELCOT TELEPHONE COMPANY

79-71                                                585 S.W. 2d 362

Opinion delivered July 9, 1979
(In Banc)
[As modified on Denial of Rehearing September 10, 1979.]

*Jack M. Wilhelm,* for appellant.

*Tom S. Lovett, Ltd.,* for appellee.

JOHN A. FOGLEMAN, Justice. On September 25, 1978, appellee, Yelcot Telephone Company, filed an application with appellant, Arkansas Public Service Commission, requesting an annual rate increase of $88,071.00. Pursuant to Ark. Stat. Ann. § 73-217(b) (Supp. 1977), appellee stated

that an immediate and impelling necessity existed and requested that appellant authorize the collection of an interim annual increase of $75,000.00, subject to refund with interest at the rate of 10 percent per annum, pending a final determination of the full rate application. It was alleged that appellee's return on common equity had fallen below one percent, and that some sort of immediate relief was imperative. As provided by the statute, a hearing was held on October 10, 1978, limited solely to the collection of the interim rates sought by appellee. By an order dated October 24, 1978, appellant denied the requested immediate rate relief, stating that the collection of such interim increases could be justified only upon a showing that a utility could not meet its minimum financial obligations, such as current payroll or interest payments. In its order, the commission stated that Yelcot produced no evidence that its ability to render adequate service will be jeopardized if emergency relief is not granted. This order also served to suspend the collection of any additional rates sought by appellee for a period of six months, during investigation of the application by appellant. Appellee's application for a rehearing was denied on November 1, 1978. On the same day, appellee filed a "petition to review, set aside and modify" appellant's order in the Circuit Court of Pulaski County, and on that day, the court, finding that appellee would suffer irreparable harm if unable to immediately begin collection of the increased rates, stayed appellant's order of October 24, 1978, and authorized appellee to begin collecting increased rates designed to produce an annual increase in revenue of $88,071.00. Appellant filed a motion to vacate this order, contending that it was a final order, entered without notice to appellant and without providing appellant an opportunity to respond to appellee's petition. Appellee filed a response joining in appellant's request that the November 1 order be modified to have only temporary effect and to give appellant notice and ample opportunity for a hearing. The order was so modified on November 22, 1978. Appellant filed the record of the proceedings held on October 10, 1978. Appellant held a full hearing on appellee's rate application on December 21, 1978. By agreement between the parties, the case was submitted to the court on briefs, rather than by a hearing, with appellant filing its brief on December 22 and appellee relying on its initial brief, filed with its petition on November 1. On

December 27, 1978, the Circuit Court of Pulaski County entered its order, holding that appellant's order of October 24, 1978 was arbitrary, staying the effectiveness of said order and authorizing appellee to place its new rate schedules into effect, subject to refund, pending the final investigation and determination by the appellant. Appellant filed its notice of appeal on January 24, 1979. Appellant entered its final order on March 6, 1979, finding that the appellee was entitled to increased annual revenues of $98,890.00, but limiting the actual increase to the amount sought, $88,071.00.

Appellant first contends that the trial court erred in holding that the diminution of a utility's earnings on common equity to a figure below one percent constitutes an immediate and impelling necessity, justifying the implementation of interim rates prior to a final decision on an application for a rate increase.

The portion of Ark. Stat. Ann. § 73-217(b) which appellee relied on in requesting implementation of interim rate relief provides:

> . . . [P]rovided, however, that if the public utility contends that an immediate and impelling necessity exists for the requested rate increase, a petition may be filed with the Commission narrating such alleged circumstances, which petition must be set for hearing within fifteen (15) days from the date of the filing thereof or to such subsequent time as may be mutually agreeable to the Commission and the utility, and if the Commission finds at such hearing that there is substantial merit to the allegation of the utility's claims, said Commission may permit all or a portion of said rate to become effective . . .

The appeal from the order of appellant is governed by the provisions of Ark. Stat. Ann. § 73-229.1 (b) (Supp. 1977). The relevant portion reads:

> . . . The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. The review shall not be extended further than to determine whether the Commission's findings are so supported by

substantial evidence, and whether the Commission has regularly pursued its authority, including a determination of whether the order or decision under review violated any right of the petitioner under the laws or Constitution of the United States or of the State of Arkansas. . . .

The sole purpose of the hearing held on October 10 was to determine if appellee's need for additional revenues was of such urgency that it constituted an immediate and impelling necessity. The only evidence presented at the hearing was the testimony of appellee's president, Calvin Czeschin, the testimony of Russell Friedrich and the written statement of Larry Seab, both of whom were consultants on appellee's rate application, and the testimony of three residents of the area served by the appellee.

Czeschin testified that appellee had undertaken a massive upgrading of all its facilities, including a complete rebuilding of some exchanges. A substantial portion of this upgrading process involved changing the eight and four-party rural services to one, two and four-party services. He stated that the addition of approximately $1,000,000.00 in gross plant had a substantial impact upon the earnings on common equity, which, at the time of the hearing, were "almost zero." (The rate application filed with appellant alleged that the earnings on common equity had fallen to "below one percent.")

The statement of Larry Seab, apparently read by Russell Friedrich, and adopted by him as his own statement, expressed the belief that appellee had a required revenue deficiency of $110,448.00, but stated that appellee was only requesting rate adjustments to make up a revenue deficiency of $88,071.00. Friedrich did not know whether the $75,000.00 interim rate increase requested would be a "minimum amount."

The remainder of the witnesses, the Mayors of Cotter and Gassville and a resident of Cotter, all of whom were served by appellee, merely related their concern about a possible increase in their phone bill and the overall effect of inflation.

Charles Kenyon testified that the service provided by appellee was good.

The Arkansas Public Service Commission is vested with two separate and distinct duties or responsibilities. The first of these is a duty to a utility company to allow it to charge rates which will provide a fair return on invested capital. The second is a duty to the public to see to it that the rates which the public must pay are not more than necessary to provide a fair return to the Company. *City of El Dorado* v. *Arkansas Public Service Commission,* 235 Ark. 812, 362 S.W. 2d 680. It is the task of the commission to weigh these interests in arriving at the most equitable rate to be charged by the utility. Because the investigation and consideration of rate applications can become such a complex and time consuming procedure, the General Assembly has given the commission the authority to suspend the collection of proposed rate increases, called "tariffs," for periods of up to six months, during the time the commission is deliberating on the application, a provision obviously designed to protect the public from the collection of rate increases which the commission later determines to be unwarranted. Ark. Stat. Ann. § 73-217. However, in recognition of the rights of the utility companies in the state to earn a fair return on invested capital, the General Assembly has also enacted the provisions of Ark. Stat. Ann. § 73-217(b), the procedure followed by appellee in this case.

Appellant has previously held the intent of the statute governing interim rate relief is that such an option is available to a utility "as a protection to it in the event that the financial stability of the company would or could be placed in jeopardy by reason of undue delay in rate adjustments." *Re Arkansas Louisiana Gas Co.,* 93 PUR 3d 201 (Ark. 1972); *Re Fordyce Water Co.,* 88 PUR NS 98 (Ark. 1951). Evidence of such "jeopardy", according to appellant, would be the inability to meet current payroll or interest payments. *Re Arkansas Louisiana Gas Co.,* supra, citing *Re Citizens Utilities Co. of California,* 89 PUR 3d 334 (Cal. 1971).

The undisputed testimony of Calvin Czeschin, supported by the introduction of schedules which accompanied the complete rate application, was that the earnings of appellee on common equity were almost zero. He attributed

this to the rebuilding program undertaken and the harsh winter weather in January and February, 1978. He stated that appellee had never paid a cash dividend to the holders of the common stock and that it was presently not able to pay all of the dividends on preferred stock. He also testified that appellee had been unable to obtain additional long term financing from local banks. On cross-examination by appellant's counsel, Czeschin stated that he did not know if appellee would be able to comply with the obligations imposed by its loan covenants, which are requirements imposed on appellee by its creditors, relating to such things as insurance and a specified ratio of earnings to interest payments. He also testified that appellee had begun to make monthly payments on its loans in an effort to meet these covenants. The rate of return on common equity allowed by appellant in appellee's last rate increase application was 12.5 percent, according to Czeschin. The present rate application of appellee projected earnings on common equity of 11.55 percent, with a requested revenue deficiency of $88,071.00. As a result of its hearings and investigation of the application, appellant finally concluded that the gross revenue deficiency of appellee was actually $98,890.00, but only granted the amount requested. A finding that appellee was entitled to a greater increase in revenues than that granted would also arguably support an allegation that it was entitled to a higher return on common equity than the 11.55 percent apparently granted. It was Czeschin's opinion that the appellee could not retain current common stockholders and acquire new ones at zero return.

Appellant had the burden of showing substantial merit in its request for the interim rate increase. In the light of this testimony, recited herein, we cannot say that the trial court erred in finding that the appellant's order of October 24, 1978, denying appellee the right to collect interim rates which would have provided an annual increase in revenues of $75,-000, was arbitrary, which, in effect, was a holding that the commission's findings were not supported by substantial evidence. The rates established for public utilities must allow a fair return on the invested capital and avoid confiscation of the property of the utility through inadequate rates. *City of Fort Smith* v. *Southwestern Bell Telephone Co.*, 220 Ark. 70, 247 S.W. 2d 474. In *Arkansas Public Service Commission* v. *Continental Telephone Co. of Arkansas*, 262 Ark. 821, 561 S.W. 2d 645, we

discussed the concept of confiscation through inadequate rates, and said:

> Confiscation simply means "the taking or seizing of private property to the public use as being forfeited." Webster's New International Dictionary, 2d Ed. In order for rates to be confiscatory, it is not necessary that they be such that the stockholders receive no return and the utility must immediately default on its debt. If the rates ultimately and foreseeably produce this result, the forfeiture is just as complete as it would be if the effect were dramatically instantaneous. . . . A wound is fatal when death is a predictable consequence, even though it is lingering rather than instantaneous.

As pointed out in appellee's brief before this court, a utility should have a fair return on invested capital (and consequently, freedom from confiscatory rates) at all times, not just part of the time, and appellant's denial of interim rates during its investigation of the appellee's rate application was not supported by any substantial evidence, and constituted a confiscation, albeit a temporary confiscation, of the appellee's property.

Appellant argues that appellee was aware of the time delays inherent in a rate application before the Public Service Commission, and that it should not be able to wait until its earnings on common equity approached zero before filing a rate application and then request that its customers be subjected to immediate rate increases pending final determination. The following testimony of Calvin Czeschin is particularly applicable to this contention:

> At the end of last year we did not have a good earnings year. We went into January and as you can remember, January and February of this last year, we thought, well, we have got a lot of maintenance and we have got people sitting around because of the bad weather and April and May ought to be better. Well, April and May weren't and that is when we came to the decision to start on this and we contacted Mr. Seab in May and we have been working on this rate case since May.

> We were hoping times would get better and we

would not have to file a rate case. We didn't anticipate, we were hoping. We had to get past January and February because they were unfair months to look at. There was no way you could look at them as normal months. So when we got to March, April and May, and they didn't do any better, we knew we had to come in for rate relief.

We do not feel that appellant should be penalized for a conscious effort to attempt to avoid, or at least postpone, a rate increase. We are similarly unimpressed with appellant's contention that appellee is imposing a burden on its customers due to unfortunate management decisions. It seems to us that if appellee had filed its rate increase in the latter part of 1977, as suggested by appellant, the customers of the appellee would have been required to pay the increased rates earlier. It is important to keep in mind that the rate application of appellee was granted in full and that the collection of interim rates was protected by a bond filed by appellee, providing for refund of any rates found to be unwarranted, plus interest at an annual rate of 10 percent.

We simply do not agree with appellant's argument that the trial court erred in staying the effectiveness of the October 24 order of appellant and authorizing the collection of the increased rates by appellee, under the circumstances prevailing here. Because of the lack of any substantial evidence to support the order of appellant, we hold that the trial court did not err.

Appellant's second point for reversal is that the trial court erred in entering its order of November 1, 1978, alleging that it was a final order which was entered without notice to appellant and without providing appellant an opportunity to respond to the petition filed by the appellee. We find this argument unpersuasive. As stated previously, upon motion of both parties, the court entered a second order on November 22, 1978, modifying the original order. This second order declared that the intended effect of the first order was only temporary and that the effectiveness of the appellant's order, which suspended the new rates sought by the appellee, was to be stayed only during the review by the court. Appellant was given a full and complete opportunity to respond to the appellee's petition, which it did in a brief filed with the trial

court on December 22, 1978, as well as an opportunity to file the record of the proceedings had before it on October 10, 1978.

Any error by a lower court is presumed to be prejudicial unless we can say with assurance that it was not prejudicial to the rights of the appellant. *Price* v. *Daugherty*, 253 Ark. 421, 486 S.W. 2d 528. See also, *International Harvester Corp.* v. *Hardin*, 264 Ark. 717, 574 S.W. 2d 260; *Allen* v. *Arkansas State Highway Com'n.*, 247 Ark. 857, 448 S.W. 2d 27; *Arkansas State Highway Com'n.* v. *Parks*, 240 Ark. 719, 401 S.W. 2d 732, 26 ALR 3d 775. We have no trouble in stating with complete assurance that the order of November 1 was not prejudicial to the rights of the appellant.

Even if the trial court was in error in entering the order in the manner in which it did, this court will not reverse a judgment for an error which is unaccompanied by prejudice, commonly referred to as "harmless error." Ark. Stat. Ann. § 27-1160 (Supp. 1977); *McCoy Farms, Inc.* v. *J & M McKee*, 263 Ark. 20, 563 S.W. 2d 409; *Household Goods Carriers* v. *Arkansas Transportation Com'n.*, 262 Ark. 797, 562 S.W. 2d 42; *Christmas* v. *Raley*, 260 Ark. 150, 539 S.W. 2d 405. We find that any possible prejudice suffered by the appellant due to the November 1 order was cured by the modifying order providing notice and an opportunity to be heard. Because the lack of prejudice suffered by appellant is manifest, especially in light of the fact that the final order entered on December 27, 1978, had the same effect as the temporary order the appellant now complains of, any error committed was harmless, and therefore does not require a reversal.

The judgment is affirmed.

HICKMAN, J., concurs.