ELCARE, INC. *v.* Charles L. GOCIO,
Executor of the Estate of Ralph W. BIGGER, Deceased

79-253                                          593 S.W. 2d 159

Opinion delivered January 28, 1980
(In Banc)

[Rehearing denied March 3, 1980.]

*Little, McCollum & Mixon,* by: *James G. Mixon,* for appellant.

*Gocio & Dossey,* by: *Jerry B. Dossey,* for appellee.

FRANK HOLT, Justice. Appellee's decedent, 68 years of age, entered into two contracts with the appellant for the purpose of securing lifetime housing and medical services at the Concordia Life Care Center owned by the appellant. One contract was entitled "Care Agreement" and the other, "Contract for the Sale of Life Estate in Living Unit." Approximately six weeks prior to his death, the decedent delivered to appellant a written notice of cancellation of the

Contract for Sale specifically citing Paragraph 5. The notice of cancellation and termination of occupancy was to be effective on the date of delivery. Following the decedent's death, appellant refused to comply with appellee's request on behalf of the decedent's estate for a refund of a percentage of the original purchase price in accordance with the notice and the terms of the contract. In refusing the request, appellant cited Paragraph 16 (d) of the Care Agreement which required a resident to give 120 days' notice of cancellation of that contract. Appellant took the position that this cancellation provision also governed by reference the cancellation of the Contract for Sale. Therefore, the effective date of the termination was 120 days from the date of the written notice to cancel the Contract for Sale. Further, since the decedent died prior to the expiration of the 120 days' notice, the contract was terminated by his death and no refund was due according to the provisions of the Contract for Sale. Upon a review of the evidence, including the two contracts, the trial court, sitting as a jury, ruled that the cancellation notice of the sale contract was effective upon delivery and the appellant was obligated to repurchase the life estate as provided in the contract.

The only issue presented by this appeal is whether the 120 days' notice provision in the Care Agreement also governed the cancellation of the Contract for Sale. Appellant argues that the contracts should be treated as a single agreement; that Paragraph 5 (A) of the Contract for Sale merely sets out the formula for the repurchase price in the event the contract is cancelled pursuant to Paragraph 16 (d) of the Care Agreement; and that the Contract for Sale can be unilaterally terminated only upon 120 days' written notice by the resident. Therefore since the notice to cancel was not effective when given, there was no substantial evidence to support the trial court's ruling. Appellee responds that the provisions in the contracts governing cancellation are confusing and ambiguous and, consequently, should be construed most strongly against the drafter, namely, the appellant. The lower court, therefore, correctly ruled that the Contract for Sale was cancelled upon delivery of the written cancellation notice.

The Care Agreement provides in pertinent part:

16. TERMINATION OF AGREEMENT. This agreement shall be terminated as follows:

(a) Upon death of Resident. . . .

(d) By Resident, by serving on Corporation one hundred twenty (120) days written notice of his desire to do so; but in such case, Resident's contract shall not terminate until the end of 120 days except by mutual agreement in writing of Corporation and Resident. The Resident will be charged with such amounts as will cover other expenses incurred in connection with any repairs or replacement of the property of Corporation caused by the Resident. The Resident shall be obliged to sell his Life Estate in said Living Unit to the Seller at the price as set forth in Paragraph 5 (A) of the Contract for the Sale of Life Estate in Living Unit, referred to in Paragraph 1 hereof. Payment of the repurchase price shall be made within 120 days of the termination date.

In the event this contract is terminated, Corporation shall be entitled to all unearned portions of the Maintenance Fee.

The Contract for Sale Agreement reads in pertinent part:

5. (A) In the event Buyer desires to terminate his occupancy, Care Agreement or his interest in said Living Unit, Seller shall be obliged to repurchase the Life Estate in said Living Unit and Buyer shall be obliged to sell his Life Estate in said Living Unit to Seller as follows:

(1) On the day which the premises are made available to the Buyer for his occupancy and during the remaining days of that same calendar month, the repurchase and sales price shall be eighty (80) percent of the original sales price.

(2) Each calendar month thereafter, the repurchase and

sales price shall decrease by three-fourths (3/4) of one (1) percent for the next one hundred (100) months.

(3) Thereafter, the repurchase and sales price shall be five (5) percent of the original sales price.

(B) In the event the Seller (other than for reasons stated in Paragraph 4 hereof) terminates Buyer's Care Agreement, Seller shall be obliged to repurchase the Life Estate in said Living Unit and Buyer shall be obliged to sell his Life Estate in said Living Unit to Seller in the same manner as set forth in subparagraph 5 (A) above.

(C) In the event of the death of one of the holders of the Life Estate, the monthly maintenance fee will be adjusted to the current single rate for a comparable unit for the surviving occupant. Upon the death of either a single occupant or of the surviving occupant, as the case may be, both this Contract and the Care Agreement shall automatically be terminated, and the Living Unit shall revert to the Seller.

The contracts were executed on the same day, were part of the same transaction, and were designed to provide an integrated program of housing and medical care for the decedent and other residents. Paragraph 1 of the Care Agreement provides that no legal obligations are created pursuant to the agreement until the parties sign the separate Contract for Sale, and that the Contract for Sale is incorporated by reference. Similarly, Paragraph 8 of the Contract for Sale provides that if the parties do not enter into the Care Agreement, the Contract for Sale is cancelled. In view of these provisions, we agree with the finding of the trial court that the contracts were incorporated by reference. However, when there is uncertainty or ambiguity in a contract or contracts and they are susceptible to more than one reasonable construction, then we must construe them most strongly against the party who drafted them, the appellant here. *Barton* v. *Perryman*, 265 Ark. 228, 577 S.W. 2d 596 (1979); *Christmas* v. *Raley*, 260 Ark. 150, 539 S.W. 2d 405 (1976); *Prepakt Concrete Co.* v. *Whitehurst Bros., Inc.*, 261 Ark. 814, 552 S.W. 2d 212 (1977). Further the drafter of a docu-

ment is in a better position to convey a clarity in meaning by its choice of phraseology and words, and if there are any uncertainties, they will be construed against the drafter of the form if the language bears more than one reasonable meaning in its interpretation. *Hall* v. *Weeks*, 214 Ark. 703, 217 S.W. 2d 828 (1949); and *Pate* v. *Goyne*, 212 Ark. 51, 204 S.W. 2d 900 (1947).

Here, tested by these standards, we hold there is substantial evidence to support the court's findings that if a buyer were required to give 120 days' notice of his desire to terminate the Contract for Sale, Paragraph 5 (A) (1) and part of 5 (A) (2) would be "meaningless", and that if the 120 days' notice governed termination of both contracts, the third sentence of Paragraph 16 (d) would be "totally unnecessary". This is a reasonable construction even though we treat the contracts as a single instrument. The appellant, the proponent of the contracts, was in a better position to prevent any ambiguities by easily expressing its intent in plain English by reiterating the 120 days' cancellation notice in the cancellation provision of the Contract for Sale. The written notice of cancellation submitted by the decedent effectively cancelled the Contract for Sale on the date of delivery.

Since there was no notice of cross-appeal by the appellee, we do not consider the issues presented therein.

Affirmed on direct and cross-appeal.

FOGLEMAN, C.J., dissents.

JOHN A. FOGLEMAN, Chief Justice, dissenting. It is extremely difficult for me to see how it can possibly be said that the two instruments involved are the result of a single transaction and are incorporated into each other by reference[1] (which makes them a single contract) and then say that there are two separate and independent means of termination for each contract. If all provisions are read in the light of each other, the two provisions in question can be read harmoni-

---

[1] This was the actual holding of the trial court which the majority finds to have been justified.

ously. This the courts must do, if at all possible. *Continental Casualty Co.* v. *Davidson,* 250 Ark. 35, 463 S.W. 2d 652. There are provisions other than those reproduced in the majority opinion that are material to the inquiry here. In reading these provisions and those set out in the majority opinion, the court should give heed to its own teachings in *Fowler* v. *Unionaid Life Ins. Co.,* 180 Ark. 140, 20 S.W. 2d 611. In essence, they were: The intention of the parties to a contract is to be gathered, not from particular words and phrases, but from the whole context of the contract, even though the immediate object of the inquiry is the meaning of an isolated clause; the interpretation must be upon the entire contract and not upon disjointed or particular parts of it; the contract must be viewed from beginning to end and all its terms must pass in review, for one clause may modify, limit or illuminate the other; seeming contradictions must be harmonized, if that course is reasonably possible; and each of a contract's provisions must be considered in connection with the others.

In the "Contract for the Sale of Life Estate in Living Unit," there are these provisions:

3. *** It is understood Seller reserves for its duly authorized officers and employees the right of entry and use as to the facilities aforesaid for management, maintenance and emergency purposes and any other purpose in connection with the duties imposed on Seller by Care Agreement with Elcare, Inc., sometimes herein referred to as "Care Agreement", executed in connection with this agreement and made a part hereof by reference. Seller agrees to furnish a policy of title insurance for the life estate in said Living Unit, in an amount equal to the purchase price, subject, however, to exceptions contained in the above description and as otherwise herein contained.

4. Time shall be and hereby is made the essence of this contract and of each and all of the conditions herein contained. ***

8. In the event Buyer and Seller do not enter into the

agreement known as Care Agreement of Elcare, Inc., or that agreement is voided prior to occupancy of Living Unit by Buyer, the sum of *Twenty-five Hundred and no/100 Dollars ($2,500.00)* paid herewith shall be refunded to Buyer and this Contract shall be cancelled.

Pertinent provisions of "Care Agreement of Elcare, Inc." are:

RECITALS:

A. ELCARE, INC. is a business corporation organized under the laws of the State of Arkansas for the purpose of founding and maintaining residences and other facilities, referred to sometimes herein as Concordia, for persons primarily over sixty-five (65) years of age, operated or to be operated in accordance with policies and directives of all applicable government agencies. Its residences and facilities are operated on a non-discriminatory basis and afford equal treatment and access to services and facilities as to all persons regardless of race, sex, color, religion, creed, national origin, or ancestry.

B. Resident is 68 years of age; has made application for residence; and such application has been approved by the Corporation, subject to the provisions of this contract;

NOW, THEREFORE, IT IS AGREED:

1. Prior to the time this agreement creates any legal obligations, Resident, and Corporation shall sign the Contract for the Sale of Life Estate in a Living Unit, in the properties known as Concordia, as required by the Corporation, and said sale contract is hereby incorporated by reference.

2. The Corporation agrees to furnish the Resident meals, care, facilities and services enumerated in this section, and no others, for the rest of the natural life of Resident, and so long as Resident remains in the accommodations maintained by Corporation and carries out his obligations under this contract.

## h. CHANGE OF ACCOMMODATIONS.

*****

The Corporation will furnish convalescent care, determined necessary by the staff physician, in its own or suitable outside medical facility, unless hereinbefore excluded. If convalescent hospitalization exceeds three (3) months and it is the opinion of the staff physician, in conference with Resident's personal physician, members of Resident's family, and/or Resident's Guardian or Conservator, that convalescent hospitalization will be permanent, Corporation will have the right and will be obliged to repurchase Resident's interest in said Living Unit and Resident will be obliged to sell his interest in said Living Unit to Corporation in the same manner as set forth in Paragraph 5 (A) of the Contract for the Sale of Life Estate in Living Unit. Credit for the repurchase of Resident's interest in said Living Unit will be applied to payment of the monthly maintenance fee charged under Section 3 of the Care Agreement. In the event of Resident's death prior to reimbursement of Resident's interest, if any, the remainder will be paid to Resident's Estate.

## 7. AGREEMENTS, CANCELLATIONS AND REPURCHASES. ***

The Corporation reserves the right of action of its Board of Directors to cancel this Care Agreement for what is, in the judgment of the Board, good and sufficient cause. It is specifically agreed that such "good and sufficient cause" shall include, but not be limited to, termination of Resident's rights according to the terms of Paragraph 4 of the Contract for Sale of Life Estate in Living Unit. Thereupon, the Corporation will be discharged from all obligations hereunder. In the event of such cancellation of the Care Agreement, Corporation shall have the obligation to repurchase the Living Unit of Resident at the price set forth in Paragraph 5 (B) of said Contract for Sale of Life Estate in Living Unit, and Resident shall be obliged to sell said Life Estate in his Living Unit to Corporation for the price and as provided in Paragraph 5 (B) of said Contract.

To reach the conclusion reached by the majority and by the trial court, it is necessary to find that two agreements which are so interdependent as to constitute a single contract may be terminated at different times by different means, although one never could have come into effect without the other.

It is significant that the determination of the repurchase price depends upon the time of *occupancy* of the Living Units by the Buyer. It is clearly contemplated that the execution of the Care Agreement and the occupancy of the Living Unit may not be simultaneous, because, under paragraph 8 of the contract for sale of the Living Unit, the down payment is to be refunded if the parties do not enter into the Care Agreement or if the Care Agreement is voided prior to the occupancy of the Living Unit by the Buyer. What is more important, the provision for payment under 5 (A) of the sale agreement could never be meaningless, because the 120 day notice is not applicable if the Resident and Corporation mutually agree upon an earlier termination.

Giving effect to paragraph 5 (A) of the sale agreement to the exclusion of paragraph 16 of the Care Agreement is error, because the two are reconcilable. *Continental Casualty Co.* v. *Davidson,* 250 Ark. 35, 463 S.W. 2d 652. Whatever the construction of paragraph 5 (A) standing alone may be, it must be read in connection with other clauses limiting it. *Continental Casualty Co.* v. *Davidson,* supra.

In other words, the two clauses are not really conflicting and certainly not hopelessly so. They can, and certainly should be, harmonized. Paragraph 5 provides the means of arriving at the amount to be paid the resident upon a termination by the resident, when agreed to by the corporation. It also provides the formula for determination of the amount to be paid to the resident if there is a termination by the corporation under another provision of the contract.

I simply do not see where the evidence, outside the contracts themselves, enters into the matter at all.

I would reverse the judgment.