FORD MOTOR CREDIT COMPANY v.
THE EXCHANGE BANK & TRUST COMPANY

5-5706                                                476 S.W. 2d 208

Opinion delivered January 31, 1972
[As amended on denial of rehearing March 6, 1972.]

*Griffin Smith,* for appellant.

*Spencer & Spencer,* for appellee.

JOHN A. FOGLEMAN, Justice. The sole question raised on this appeal is the sufficiency of the evidence to support a jury verdict in favor of appellee for recovery of the face amount of two drafts drawn on Ford Motor Credit Company by J J Motors, Inc., an automobile dealership doing business in El Dorado. The jury verdicts were necessarily based upon a finding against appellant on the issues of estoppel and unjust enrichment.

The question was presented by motions for a directed verdict and objections to instructions of the court submitting those issues. We agree with the appellant that the evidence was not sufficient to support the verdict, or to justify the submission of the issues to the jury.

Ford Motor Credit Company entered into an agreement with J J Motors to purchase contracts on new and used cars financed by J J Motors which were acceptable to the company but was not obligated, under the agreement, to purchase any particular contract. FMCC furnished J J Motors with its forms of contracts on which credit could be advanced and form sight drafts for the use of the dealer in the sale of its contracts to FMCC, but did not require the dealer to use this form of draft. It was admitted that the president of J J Motors was instructed to make out the drafts for the amount of the respective contracts submitted for purchase in duplicate and to deposit one copy of the draft in the bank with which the dealer did business and to mail a copy of each such draft to appellant with the contract attached.

The dealer had an account in the Exchange Bank and Trust Company at El Dorado. When the first such draft was brought to this bank by the dealer in the latter part of 1966, the bank was asked to give immediate credit to the dealer's bank account. At that time Bob Tinkle was vice-president and cashier of appellee. He continued in that capacity through January 1968, but had no connection with the bank at time of trial. He testified that before appellee agreed to give immediate credit for the amount of any draft, he called appellant's branch office in Monroe, through which the dealer's contracts were handled, and talked to the branch manager. Tinkle advised appellant's manager that the dealer wanted immediate credit on these drafts, and asked what appellant normally did in the course of the business, how it paid these drafts, whether it wanted appellee to send the drafts for special collection or whether appellant paid them through the normal course of business. According to Tinkle, the branch manager told him that the normal, accepted practice was for the dealer to draw his drafts, deposit them in the bank and when appellant

received the contracts from the dealer, the draft would be paid at appellant's bank in Monroe, if the contracts were in order.

Appellee then accepted the drafts presented for immediate payment on that occasion and continued the practice until the date of the drafts in question here solely upon the basis of this conversation. Appellee's claim of estoppel is based entirely upon this conversation, and the ensuing course of dealing among the parties. It appears from the testimony that appellant never failed to accept any draft presented to it in this manner, and that there was never any occasion, prior to the presentation of the drafts involved in this case, where appellant accepted any contract of the dealer without also accepting the draft.

Following the usual practice, J J Motors drew drafts for $2,363.14 on one contract and for $1,664.42 on another on March 3, 1969. They were treated by appellee as cash and deposited to the account of the dealer on the same date. The dealer's account was then overdrawn, partially by reason of the payment by appellee of certain checks drawn on the account by the dealer payable to the order of appellant. After crediting the amount of these drafts to the account of J J Motors, appellee issued its checks for $1,943.63 and $788 to appellant to cover two additional checks of the dealer payable to appellant which had been presented to appellee for payment and charged them to the dealer's account. The drafts were presented in due course to appellant through its bank in Monroe, the Ouachita National Bank. The dealer had, pursuant to appellant's instructions, forwarded the respective contracts for which these drafts were drawn to FMCC at Monroe, with copies of the drafts. In spite of appellant's knowledge that the contracts were submitted for purchase only, it accepted and retained the two contracts, but refused acceptance of the drafts which were returned to appellee bearing the typed notation: "Drafted in error, FMCC." When the drafts were returned to appellee, the dealer had declared bankruptcy.

It is undisputed that, at the time of the drawing and presentation of these drafts, both parties were aware of

the dealer's precarious financial condition. It is also admitted that the contracts submitted qualified for acceptance by appellant under the terms of its agreement with the dealer. Appellant's branch manager at the time the drafts were presented explained that the reason for not accepting the drafts was that appellant already had a security interest in both of the vehicles covered by the contracts, one of which was floor-planned and the other subject to an outstanding contract held by appellant. He stated that appellant had conducted an inventory on March 7, and found that the dealer had sold some $23,000 worth of items out of trust for which he could not pay appellant, and that this fact entered into its failure to accept the drafts and its determination to retain the contracts as proceeds of sale of collateral securing an indebtedness to FMCC far in excess of the amount of the drafts. The instruments evidencing the security interests of appellant in the particular vehicles were introduced without objection. There was no other evidence relating to the contracts submitted to appellant or the reasons for its failure to accept the drafts.

The chairman of the board and chief executive officer of appellee, a banker with 50 years' experience, testified that he would have accepted these two drafts under the circumstances if he had been cashier of the bank and that their acceptance for immediate credit, under those circumstances, was in keeping with good banking practice. He stated that the bank took a chance every time it handled a draft as a cash item and that doing so was a matter of good business judgment and the accommodation of its customers. He admitted that appellee could have given both appellant and itself absolute protection, if it had accepted the drafts for collection or if it had demanded that the contracts accompany the draft. He felt that his bank's action in the matter was based upon an assurance that appellant would pay all such drafts.

There was no specific evidence that any draft had previously been drawn on appellant based upon a contract covering a vehicle on which appellant already had a security interest so that the contract actually repre-

sented the proceeds of sale of its collateral, or that the dealer had previously failed to account for the sale of any automobile out of trust.

Appellant relied upon Ark. Stat. Ann. §§ 85-3-409, 410 (Add. 1961), and contended that until there was a written acceptance of the draft, there was no liability on its part. Appellee, on the other hand, contended that the exception in § 85-3-409(2) provided that nothing in that section should affect any liability in contract, tort or otherwise arising from any letter of credit or other obligation or representation which did not consititute an acceptance, and that under the doctrine of estoppel there was such an obligation. Specific reliance is placed on the committee comment on the above subsection, in which it is stated that the intention of this subsection was to make it clear that the section did not affect any liability arising apart from the instrument itself and that a drawee might be liable in tort or upon any other basis because of this representation that he has accepted, or that he intends to accept. Thus, says appellee, estoppel prevents appellant from availing itself of this defense.

Ever since our decision in *Arkansas National Bank* v. *Boles,* 97 Ark. 43, 133 S. W. 195, we have been committed to the doctrine that, since estoppel bars the truth to the contrary, the party setting it up must prove it strictly, that there must be certainty to every intent, that the facts constituting it must not be taken by argument or inference and that nothing can be supplied by intendment. See, *James Talcott, Inc.* v. *Associates Discount Corp.* 302 F. 2d 443 (8th Cir. 1962); *McFaddin* v. *Bell,* 168 Ark. 826, 272 S. W. 62.

When we apply this rule to this case, we cannot say that the statement of appellant's branch manager, relied on here, was sufficiently definite to furnish a basis for an estoppel. It is not disputed that this manager told Tinkle that the dealer's drafts would be paid if the contracts received from him were in order. It certainly cannot be said that this statement could not properly be taken to mean that appellant had the right to do exactly what it did, *i. e.,* refuse payment of drafts presented after the

dealer had failed to account for the proceeds of sales of other automobiles out of trust, when those drafts covered the proceeds of sale of other collateral. As a result it could be said that the contracts were not in order. This being the case, we cannot say that there was sufficient certainty to permit the raising of an estoppel. On the other hand, in order to reach the result for which appellee contends, the obligation to pay if the contracts were properly executed would have to be supplied by argument, inference and intendment. Certainly it cannot be said that a statement that appellant would pay drafts if the "contracts were in order" made more than two years earlier should be taken to mean that appellant could never refuse a draft just because the supporting contract was properly signed, after it was on notice that steps to protect its own collateral were necessary. It can be forcefully argued, as appellant does, that whatever answer its branch manager gave to the inquiry by the bank's Vice President and Cashier was not intended to amount to anything more than a description of the normal routine followed in the presentation and payment of dealer's drafts.

This is not a case calling for application of the doctrine of unjust enrichment. In *Whitley* v. *Irwin*, 250 Ark. 543 (1971), 465 S. W. 2d 906, we held that one is not unjustly enriched by receipt of that to which he is legally entitled and that no recovery can be based upon unjust enrichment when the recipient can show a legal or equitable ground for keeping it. It cannot be seriously doubted that appellant had a legal right to the proceeds of the sale of collateral by its debtor, and, in the absence of estoppel, it certainly had an equitable ground for keeping these proceeds. It also had a clear legal right to the proceeds of the checks of J J Motors voluntarily paid by appellee.

Since we find no fact issue as to either estoppel or unjust enrichment, the judgment is reversed and the cause dismissed.