**FIRST NATIONAL BANK IN ALAMOSA, Plaintiff,**

v.

**FORD MOTOR CREDIT COMPANY, a Delaware corporation, Defendant.**

**Civ. A. No. 88–N–317.**

United States District Court, D. Colorado.

Oct. 3, 1990.

Mark A. Pottinger, Coghill & Goodspeed, P.C., Denver, Colo., for plaintiff.

Donald M. Burkhardt, Grant, McHendrie, Haines & Crouse, Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

NOTTINGHAM, District Judge.

Plaintiff First National Bank in Alamosa's ("the Bank's") lawsuit against Ford Motor Credit Company ("Ford") is based on Ford's refusal to honor nine sight drafts presented to Ford, as acceptor or drawee, and directing it to pay a total of $93,144.86. The drafts were drawn on Ford by Clark/Cravens Alamosa Motors, Inc. (the Bank's customer and a car dealer associated with Ford Motor Company), and delivered to the Bank for collection through the commercial banking system. Alamosa Motors initiated the collection process by depositing the nine drafts into its account at the Bank between March 3, 1986, and March 10, 1986. The Bank treated the drafts as "cash items"—that is, it credited Alamosa Motors' account and permitted Alamosa Motors to have immediate use of the funds represented by that credit, as had been its practice when Alamosa Motors deposited similar drafts on prior occasions. Unfortunately, the principals of Alamosa Motors left town, literally in the middle of the night, around March 12, 1986. By the time the sight drafts (1) had been presented through the interbank collection system, (2) were dishonored, and (3) came back to the Bank, Alamosa Motors' account at the Bank was overdrawn by $64,543.28. Unable to recover from Alamosa Motors, the Bank initiated this lawsuit against Ford.

The case, which defendant has removed to this court on account of the parties' diverse citizenship, involves three claims for relief. First, the Bank asserts that, when Alamosa Motors signed the sight drafts, it did so as an "agent or authorized representative" of Ford and thereby obligated Ford to honor the drafts. Second, the Bank alleges that Ford was negligent in introducing "confusing and misleading negotiable instruments" into the commercial banking system. Third, the Bank asserts a promissory estoppel claim, arguing that Ford orally promised to pay the drafts and that it has detrimentally relied on the promise by giving Alamosa Motors immediate credit for the drafts.

Ford has moved for summary judgment on all three claims for relief, and the Bank has moved for summary judgment on the third claim. These motions are now before the court for decision. The parties agree that articles three (commercial paper) and four (bank deposits and collections) of the Uniform Commercial Code (UCC), enacted in Colorado as Colo.Rev.Stat. §§ 4-3-101 through 4-4-504 (1973), supply the applicable principles of law. Resolution of the motions therefore requires me, first, to discuss the commercial setting in which these drafts were used and, second, to analyze the parties' business relationship and transactions in terms supplied by the UCC.

## I. FACTS

### 1. The Commercial Setting.

Ford provides blank, pre-printed drafts such as the nine at issue here to approved dealers of Ford Motor Company. The drafts are among the numerous documents used in the system by which Ford finances automobile sales to consumers. The customer who wants to buy a car on credit from a Ford Motor Company dealer enters into a retail installment sales agreement with the dealer, promising to pay the amount financed and giving the dealer a security interest in the automobile. Since dealers do not typically want to finance the sale themselves, Ford's system provides a means by which Ford assumes responsibility for financing the consumer's purchase and the dealer receives the amount financed. To use this system, a dealer does two things. First, after the consumer signs the retail installment sales agreement, the dealer assigns the agreement to Ford and sends the agreement and related documents to Ford for approval. Second, the dealer completes one of the pre-printed drafts (by paying itself or its bank the amount financed) and presents the draft for payment through the commercial banking system. Assuming that the documents are in order and that Ford agrees to finance the transaction, Ford transfers the amount financed to the dealer by honoring

the sight draft. According to Ford's evidence (undisputed by the Bank), sight drafts are commonly used in the automobile industry. Their purpose is to facilitate and expedite payment to the dealer.

The nine sight drafts also contain the language "payable through ... The First National Bank, Colorado Springs, Colorado," which is printed in the lower left-hand side of each draft. To understand how the drafts were used, this provision must be explained. Ford employed The First National Bank of Colorado Springs as its "collecting bank." *See* UCC § 3–120, Colo. Rev.Stat. § 4–3–120 (1973) ("An instrument which states that it is 'payable through' a bank or the like designates that bank as a collecting bank to make presentment *but does not of itself authorize the bank to pay the instrument.*") (emphasis added). After a collecting bank such as the First National Bank of Colorado Springs receives a sight draft from a depositary bank, it contacts Ford to ask Ford if it is prepared to pay the draft. If Ford disapproves the transaction, it instructs its collecting bank to dishonor the sight draft. If it wants to pay the draft, Ford instructs the collecting bank to pay the draft and mails the collecting bank a Ford check in the amount of the draft. The collecting bank, in turn, pays depositary banks, such as First National Bank in Alamosa, the amount of the sight draft, by means of inter-bank credits provided through the Federal Reserve system.

Dealers often execute and deposit the pre-printed Ford sight draft with their local bank as soon as the consumer sale is made. This can create problems. If the sight draft reaches Ford's collecting bank through the bank collection system before the retail installment sales agreement reaches Ford through the mails, Ford will instruct its bank not to honor the dealer's sight draft. More importantly, Ford will not honor a sight draft if the agreement and related documents are not in order, or if the dealer has failed to pay Ford the wholesale price for the car which the dealer has sold and proposes to finance through Ford.

### 2. The Parties' Business Relationship and Transactions.

The nine drafts in question here were used in the commercial setting described above. Each sight draft represents a separate retail consumer financing transaction. Ford dishonored seven of the drafts because Alamosa Motors had not paid Ford the wholesale price of the car which it was seeking to have Ford finance. It rejected an eighth because Alamosa Motors had not submitted to Ford the retail installment sales agreement. It rejected the ninth because the automobile in question had previously been leased, and Alamosa Motors had not paid off the retail lease account on the vehicle.

All nine instruments in question are similar. The rectangular printed forms contain the Ford corporate logo and the words "Ford Motor Credit Company" in the upper left-hand corner. There is no doubt that they are properly characterized, under the UCC, as "drafts," since each is an "order" directed expressly "TO Ford Motor Credit Company," as drawee, to pay the amount specified in the draft. *See* UCC § 3–104(2)(a), Colo.Rev.Stat. § 4–3–104(2)(a) (1973) (negotiable instrument is a "'draft' ... if it is an order"); UCC § 3–102(1)(b), Colo.Rev.Stat. § 4–3–102(1)(b) (1973) ("An 'order' is a direction to pay."). Each draft is payable to the order of "Alamosa Motors, Inc.," as payee. Each is signed in the lower right-hand corner by the drawer, "Alamosa Motors, Inc." (words affixed to the draft by typewriter), acting by "Maureen Gonzales" (words affixed by manual signature), Alamosa Motors' title clerk. In other words, Alamosa Motors made the sight drafts payable to itself. On the reverse side, it indorsed each draft, "PAY TO THE ORDER OF FIRST NATIONAL BANK OF [sic] ALAMOSA; FOR DEPOSIT ONLY; ALAMOSA MOTORS, INC." It then deposited the drafts to its account at the Bank. The First National in Alamosa was thus the "depositary bank" in this case. *See* UCC § 4–105(a), Colo.Rev.Stat. § 4–4–105(a) (1973) (" 'Depositary bank' means the first bank to which an item is transferred for collection."). The drafts were then

presented for collection through the commercial banking system.

As I have indicated, the Bank regarded sight drafts such as those at issue here as "cash items." William Griggs, president and primary loan officer of the Bank during the relevant time period, and David E. Broyles, who held the title "senior loan officer" during the period, testified that the Bank gave Alamosa Motors immediate credit for the drafts and did not place a "hold" on the funds represented by the credit. Griggs testified that it was "the normal course of business" to give immediate cash credit to auto dealer sight drafts. In his experience as a banker in Colorado and several other states, Griggs had never previously seen a sight draft returned. Mr. Broyles testified that sight drafts from Ford were "pretty frequent" and that "we thought we had a course of dealing, that they were being accepted." He affirmed that the Bank treated the sight drafts as cash items, instead of giving only provisional settlements, admitting that "there is always an element of risk" in giving immediate credit but that the bank considered the risk "minimal". He explained:

> Oh, I think that [the risk] was very minimal. We considered that it was Ford Motor Credit that wrote the check [sic], and it was the obligation of Ford Motor Credit Company. And I guess what we're saying, we're looking at the Ford Motor Credit Company backing up the instrument.

As the basis for his belief that Ford Credit would back up the instruments, Broyles cited his prior experience with sight drafts and his experience with this particular auto dealer and its predecessor. Also, Mr. Broyles stated that he remembered a conversation in the spring or summer of 1985 between President Griggs and himself. As Broyles remembered the conversation, Griggs told Broyles that he had asked Ford whether the sight drafts should be treated as "cash items" or "collection items." Ford had assured Mr. Griggs that the bank could handle sight drafts as cash items. Mr. Griggs, however, testified at his deposition that he did *not* recall having any conversations whatsoever with Ford concerning sight drafts.

## II. LAW

### 1. First Claim for Relief—Liability on the Instruments Themselves.

■ Ford is not liable on these nine instruments for the simple reason that it did not "accept" the sight drafts. UCC § 3–410(1), Colo.Rev.Stat. § 4–3–410(1) (1973) ("Acceptance is the drawee's *signed* engagement to honor the draft as presented. *It must be written on the draft*, and may consist of his signature alone.") (emphasis supplied). Under the UCC, a drawee who refuses acceptance is generally not liable *on the instrument.* UCC § 3–409(1), Colo.Rev.Stat. § 4–3–409(1) (1973) ("A check or other draft does not of itself operate as an assignment of any funds in the hands of the drawee available for its payment, and the drawee is not liable on the instrument until he accepts it.") Plaintiff's remedy on the instruments is against the drawer of the drafts, Alamosa Motors. UCC § 3–413(2), Colo.Rev.Stat. § 4–3–413(2) (1973) ("The drawer engages that upon dishonor of the draft and any necessary notice of dishonor or protest he will pay the amount of the draft to the holder....").

The Bank seeks to avoid the conclusion that Ford is not liable on the instruments by advancing two arguments. First, it asserts that the name "Ford Motor Credit Company" is prominently pre-printed on the drafts in two places—once in the upper left-hand corner (next to the Ford logo) and once in the middle of the draft, on the left-hand side, in the form, "TO Ford Motor Credit Company." The Bank notes that Ford supplied these forms to its dealers as a means of facilitating payment to the dealers. It concludes that Ford has thus "signed" the instruments—or, at least, that the appearance of Ford's name on the instruments creates a genuine issue of material fact concerning Alamosa Motors' authority to "sign" them on Ford's behalf and therefore precludes summary judgment for Ford.

The Bank's first argument must fail because, as a matter of law under the applicable provisions of the UCC, it has not "signed" the instruments in question here

by pre-printing its name on them in the manner described. Under the UCC, a party "signs" a writing when the party affixes its name or symbol to the writing "with *present intention* to authenticate" the writing. UCC § 1-201(39), Colo.Rev.Stat. § 4-1-201(39) (1973) & official comment 39 (defining "signed") (emphasis supplied). *See also* UCC § 3-401, Colo.Rev.Stat. § 4-3-401 (1973) & official comments 1 & 2 (no person is liable on an instrument unless the person has "signed" the instrument).

In deciding whether a party has affixed its name to an instrument with a "present intention" to authenticate the instrument, courts "must use common sense and commercial experience...." UCC § 1-201, Colo.Rev.Stat. § 4-1-201 (1973) official comment 39. "A typewritten or printed name on the top of the instrument, like a letterhead or billhead, ... will rarely be found to be a signature." 4 W. Hawkland & L. Lawrence, *Uniform Commercial Code Series* ¶ 3-401:09 at 510 (1984). *See also Agric. Nat'l Bank of Pittsfield v. Great American Indem. Co.*, 287 Mass. 414, 192 N.E. 8 (1934) (pre-Code case). In *Pittsfield,* a national insurance company pre-printed drafts, with itself as drawee, and supplied these forms to its claims agents. The claims agent signed the draft in question, but the collecting bank, upon the instructions of the insurance company's home office, refused to honor the draft. The court held that the insurance company did not "sign" the draft forms, because the mere printing and furnishing of the forms to the claims agent did not evidence an intent to authenticate the drafts.

Here, the nine drafts themselves sufficiently demonstrate, on their face, that the words "Ford Motor Credit Company" were not placed thereon with a "present intention" to authenticate the drafts. With respect to the appearance of the words "TO Ford Motor Credit Company" on the left-hand side of each draft, it is clear on the face of each instrument that the words are directed to Ford as the "drawee" or prospective "acceptor" of the draft. A drawee's name necessarily appears on every draft, so that other parties to the instrument will know the identity of the party to whom the instrument must be presented for acceptance. To hold that the mere printing of the drawee's name on the instrument may be used as evidence of a "present intention" to authenticate the instrument would deprive the drawee of its right to accept or reject the instrument, introduce considerable uncertainty concerning the use of such instruments, and limit the usefulness of the instruments in commercial transactions. The same may be said of the Ford logo and the words "Ford Motor Credit Company" in the upper left-hand corner of each draft. Since it is clear on the face of each instrument that the instrument is a "sight draft" and that Ford is the "drawee" or prospective "acceptor," these pre-printed words amount to a letterhead or billhead and are without additional legal significance.

The point concerning the significance of the pre-printed words "Ford Motor Credit Company" on these drafts can be made by comparing them to a more common form of draft—the ordinary check. *See* UCC § 3-104(2)(b), Colo.Rev.Stat. § 4-3-104(2)(b) (1973) ("'check' ... is a draft drawn on a bank"). Checks are commonly pre-printed with the name of the drawee bank in the place where Ford's name appears as drawee on the drafts here and the name of the account holder and prospective drawer at the top of the check. One authoritative treatise on the UCC has made the point as follows:

> Comment 2 to 3-401 tells us that a person may make his signature in a variety of ways: "handwritten, typed, printed or made in any other manner." Under this broad view an imaginative plaintiff might argue that pre-printed forms (for instance, checks) with the name of a corporation or individual inscribed on them are "signed" instruments. Before one tears up all his pre-printed checks, he should consider section 1-201(39). "'Signed' includes any symbol executed or adopted by a party with the present intention to authenticate a writing." One would be hard pressed to maintain that a party had "present intention to authenticate" whatever might later be written on a check when he ordered a

batch of checks with his name printed on them.

1 J. White & R. Summers, *Uniform Commercial Code*, ¶ 13–2 at 624 (3d ed. 1988). The pre-printed Ford sight drafts with the Ford name and corporate logo are no more a "signature" than are any individual's pre-printed personal checks, which do not ordinarily constitute the signature of either the individual or the drawee bank.

The Bank's second argument for holding Ford liable on the instruments is a variation on the first: invoking section 3–403 (Colo.Rev.Stat. § 4–3–403 [1973]), it asserts the right to prove at trial that Alamosa Motors, acting through its title clerk, Maureen Gonzales, signed the drafts as Ford's authorized agent and thereby obligated Ford on the drafts. Section 3–403 provides as follows:

> (1) A signature may be made by an agent or other representative, and his authority to make it may be established as in other cases of representation. No particular form of appointment is necessary to establish such authority.

Claiming that Alamosa Motors' authority to sign the drafts as Ford's agent or representative is a factual matter to be resolved at trial and that the matter must be resolved by taking parol evidence, the Bank argues that Ford's motion for summary judgment on the Bank's first claim must be denied.

The Bank's argument ignores the remaining parts of section 3–403 and therefore misconceives the section as a whole. As the official comments explain, a principal is not liable under section 3–403 unless the principal's name appears on the instrument. "Even though he [the agent] is authorized the principal is not liable on the instrument, under the provisions (Section 3–401) relating to signatures, *unless the instrument names him and clearly shows that the signature is made on his behalf.*" UCC § 3–403, Colo.Rev.Stat. § 4–3–403 (1973) official comment 2 (emphasis supplied). If the agent signs his own name and does not name the principal or indicate that the signature is made in a representative capacity, the agent—not the principal—is obligated on the instrument. UCC § 3–403(2)(a), Colo.Rev.

Stat. § 4–3–403(2)(a) (1973). In such a situation, "parol evidence is inadmissible under subsection (2)(a) to disestablish [the agent's] obligation." UCC § 3–403, Colo. Rev.Stat. § 4–3–403 (1973) official comment 3. In other words, the Bank may invoke section 3–403(1) and introduce parol evidence to establish Alamosa Motors' authority to act for Ford *only if* Ford is identified as the party whose name is being signed. When an authorized agent signs an instrument in a way which makes it unclear whether he intended to obligate his named principal or himself, section 3–403 provides a set of rules which enable a holder of the instrument to determine, solely by reference to the instrument itself, which of the two parties is bound; it does not provide a general warrant for a court to receive parol evidence that a named agent was acting on behalf of an unnamed principal.

Here, the nine drafts show on their face that Ford was not named as a drawer. Each draft contains two lines in the lower, right-hand corner. The first is a blank followed by the pre-printed word, "DEALER." The second is a blank followed by the pre-printed word, "TITLE." The words, "Alamosa Motors, Inc.," are typed in the blank on the first line, before the word "DEALER." The manually-affixed words "Maureen Gonzales" and the typed words "Title Clerk" occupy the second line, before the word "TITLE." As the UCC makes clear, "[B]y long established practice judicially noticed or otherwise established a signature in the lower right hand corner of an instrument indicates an intent to sign as the maker of a note or the drawer of a draft." UCC § 3–402, Colo. Rev.Stat. § 4–3–402 (1973) official comment. The *most* that the Bank could argue from the way in which the drawee signature blocks are completed is that the word, "DEALER," in each block ambiguously suggests a signature in a representative capacity. Even so, the UCC clearly states that the signature operates to bind the purported agent, not the unnamed principal, and prohibits the receipt of parol evidence *in an action brought by a holder of the instrument.* UCC § 3–403(2)(b), Colo. Rev.Stat. § 4–3–403(2)(b) (1973) & official

comment 3 ("[T]he section [3–403(2)(b)] admits parol evidence in litigation between the immediate parties [the principal and agent] to prove signature by the agent in his representative capacity.").

Under section 3–403(3), then, the legal effect of the drawee signature space, as completed on each draft, is that Alamosa Motors, not Ford, is liable on the drafts as a drawer. Contrary to the Bank's argument, the fact that Alamosa Motors affixed the words, "Alamosa Motors, Inc.," instead of using its full proper corporate name, "Clark/Cravens Alamosa Motors, Inc.," is not relevant. A party's proper or full name need not be used for the words to be effective as a signature. UCC § 3–401(2), Colo.Rev.Stat. § 4–3–401(2) & official comment 2.

Although the argument is not explicit, the Bank also seems to suggest that it may properly invoke section 3–403 to introduce parol evidence concerning Alamosa Motors' authority to act for Ford, because (as previously noted) Ford's name does appear elsewhere on the drafts, albeit not in the drawer signature blocks. This suggestion ignores the requirement that an alleged principal is liable for signing the instrument only if the instrument names him *and clearly shows* that the signature is made on his behalf. UCC § 3–403, Colo.Rev. Stat. § 4–3–403 (1973) official comment 2. Ford's pre-printed name in the upper left-hand corner, diagonally opposite the drawer signature block, does not constitute such a showing. Neither does the appearance of its name as the drawee or prospective acceptor. Because Ford is not liable on the drafts, having neither accepted them as drawee nor signed them as drawer, and because the UCC does not permit the introduction of parol evidence in these circumstances, Ford is entitled to summary judgment on the Bank's first claim for relief.

### 2. *Second Claim for Relief—Negligence.*

■ In claiming that Ford is liable on a negligence theory, the Bank asserts that Ford has carelessly designed form instruments with the words "Ford Motor Credit Company" and "SIGHT DRAFT" prominently displayed thereon and allowed those instruments to circulate in the commercial banking system. Thus, argues the Bank, Ford has confused depository banks and misled them into thinking that the instruments were backed up by Ford and would always be honored by Ford. Ford never told the Bank "that the drafts might not be honored by" Ford or that Ford "did not consider the drafts to be drawn by [Ford] or against [Ford] funds." *Complaint* ¶¶ 18, 19.

The Bank's negligence claim must fail, because Ford did not owe the Bank or anyone else a general duty to refrain from preparing and using instruments such as the nine at issue here. There is nothing confusing or misleading about the words "SIGHT DRAFT." "Sight drafts" and drafts "payable through" collecting banks are expressly recognized by the UCC, discussed. in numerous court decisions, and used regularly in commerce. The significance of the term "sight" has been explained as follows: "Commercial parlance often uses the rather inexact terms of 'sight draft' versus 'time draft'. *Both terms refer to the maturity date of the draft:* A sight draft is payable on demand while a time draft is payable a certain time after acceptance by the drawee or after 'sight' ". B. Clark, *The Law of Bank Deposits, Collections and Credit Cards* ¶ 7.1[1] at 7–2 (1981) (emphasis supplied). *Accord,* UCC § 3–108; Colo.Rev.Stat. § 4–3–108 (1973) (sight drafts are "instruments payable on demand"). Ford's evidence demonstrates (and the Bank does not dispute) that the sight draft system is widely used in the automobile industry. The reported cases also suggest that sight drafts are commonly used in other industries. *See, e.g., Drummond v. Hales,* 191 F.2d 972 (10th Cir.1951) (sight drafts used in cattle industry) (pre-UCC case); *First Nat'l Bank of Dodge City v. Perschbacher,* 335 F.2d 442 (10th Cir.1964) (sight drafts used in cattle industry) (no liability for drawee absent "consent"—or "acceptance," to use UCC terminology).

Similarly, the use of Ford's name on the drafts is not confusing or misleading; indeed, it would have been confusing had Ford's name not appeared on the drafts.

The words, "TO Ford Motor Credit Company," clearly name Ford as the drawee and thus identify for holders of the drafts the person to whom they must be presented. As previously noted, there is no general drawee liability where the drawee has neither accepted nor signed the instrument. If the Bank was confused or misled by the drafts, it was because of its own misunderstanding of the nature of these instruments. Ford is thus entitled to judgment on the negligence claim.

### 3. Third Claim for Relief—Promissory Estoppel.

■ Defendant's motion for summary judgment on plaintiff's promissory estoppel claim raises a threshold question. Ford urges that the parties' rights and liabilities here must be determined solely under the UCC and that the common law doctrine of promissory estoppel is thus unavailable as a basis for relief. Noting that the UCC provides a comprehensive scheme governing rights and remedies of parties to negotiable instruments, defendant argues that the Bank should not be allowed to skirt that scheme by relying on additional remedies created outside the UCC. Allowing such reliance here, concludes defendant, would permit circumvention of the UCC rule that a drawee is not liable on a draft absent his written acceptance of the draft. It would therefore create uncertainty concerning a drawee's liability and impair the negotiability of such drafts.

Ford's argument is unpersuasive, because at least two sections of the UCC itself permit the Bank's promissory estoppel claim here. In what one book has called the "most important single provision in the Code" (J. White & R. Summers, 1 *Uniform Commercial Code* § 5 at 19 [3d ed. 1988]), the UCC states:

> Unless displaced by the particular provisions of this Act [the UCC], the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, *estoppel,* fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.

UCC § 1–103, Colo.Rev.Stat. § 4–1–103 (1973) (emphasis added).

Moreover, the very section of the UCC which provides that the drawee has no general liability to the holder on the instrument, absent acceptance, states:

> (1) A check or other draft does not *of itself* operate as an assignment of any funds in the hands of the drawee available for its payment, and the drawee is not liable *on the instrument* until he accepts it.

> (2) Nothing in this section shall affect any liability in *contract, tort or otherwise* arising from any letter of credit *or other obligation or representation* which is not an acceptance.

UCC § 3–409, Colo.Rev.Stat. § 4–3–409 (1973) (emphasis added).

Thus, although Ford is not liable *on the instruments* because it did not accept the sight drafts, it may be liable to the Bank on another basis, such as the Bank's promissory estoppel theory. Contrary to Ford's apprehension, this holding does not seriously affect the negotiability or usefulness of drafts such as these. Since the general liability of drawees, holders, and other parties *on the instruments* can still be determined by reference to the instruments themselves, negotiability should not be significantly impaired. Sections 1–103 and 3–409(2) simply permit a court to impose liability, separate and apart from liability on the instruments, where particular circumstances concerning the parties' relationship legally justify such liability. The question here is whether the parties' relationship gives rise to a promissory estoppel claim.

■ The Colorado Supreme Court has adopted the principles of promissory estoppel articulated in section 90(1) of the Restatement (Second) of Contracts (1963). *Kiely v. St. Germain,* 670 P.2d 764, 767 (Colo.1983). Section 90(*l*) reads as follows:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement

of the promise. The remedy granted for breach may be limited as justice requires. Privity is not necessary in a suit based upon a theory of promissory estoppel. *Galie v. RAM Assoc. Management Services, Inc.*, 757 P.2d 176, 178 (Colo.App.1988). The purpose of the promissory estoppel theory is to provide a remedy in equity, where the promises relied upon would not otherwise be enforceable under contract law principles. *Vigoda v. Denver Urban Renewal Auth.*, 646 P.2d 900, 905 (Colo. 1982).

Here, the Bank argues that it had an oral understanding with Ford that the sight drafts could be treated as "cash items" which would result in immediate credit to the dealer's account, without any "hold" on the funds. Since Ford should have anticipated that the Bank would rely on this understanding by immediately making funds available to the dealer, says the Bank, Ford is now bound to honor the drafts. The issue thus presented is whether the Bank's proof regarding the existence of this direct oral promise creates a genuine issue of material fact which would defeat Ford's summary judgment motion. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (non-moving party, to defeat summary judgment motion, must produce sufficient evidence on elements essential to its case to justify submission of the case to trier of fact).

Mr. Griggs, the Bank's president and the officer who supposedly spoke to Ford personnel and arrived at the oral understanding with them, testified unequivocally at his deposition that he did not recall any conversation with Ford personnel concerning the sight drafts. Although Mr. Broyles, the other bank officer involved, testified that *Mr. Griggs later told him of such a conversation,* this testimony would appear to be inadmissible hearsay, if offered to prove the oral understanding with Ford. Fed.R.Evid. 801, 802. Mr. Broyles never testified that *he* had a similar conversation with a Ford employee. The Bank has therefore not produced proof of an oral understanding sufficient to survive Ford's motion for summary judgment on the promissory estoppel claim.

■ Perhaps recognizing the factual weakness of its assertion concerning an express oral understanding with Ford, the Bank next argues that Ford, in these circumstances, has impliedly promised to honor the sight drafts. It relies exclusively on *Liberty Nat'l Bank & Trust Co. v. Gen. Motors Acceptance Corp.*, 85 A.D.2d 889, 446 N.Y.S.2d 758 (1981). In *Liberty Nat'l,* the appellate court affirmed a decision granting summary judgment in favor of plaintiff, a payee bank, in an action for wrongful dishonor of drafts drawn by an automobile dealer on General Motors Acceptance Corporation ("GMAC") and issued by the dealer to the bank's order. Defendant GMAC dishonored the drafts because the dealer was heavily indebted to GMAC on loans GMAC had made to the dealer to purchase cars from the manufacturer, General Motors Corporation. The court held:

> The draft forms, which were prepared and published by defendant for use by automobile dealers, obviously invited a payee bank to credit the car dealer's account with the amount of the draft and impliedly promised that defendant would honor the draft provided that the conditions stated thereon were met. Plaintiff accepted defendant's invitation which constituted an offer; the offer and acceptance were supported by consideration; and the conditions were met. Under these circumstances, defendant is liable to plaintiff.

*Liberty Nat'l Bank & Trust Co. v. Gen. Motors Acceptance Corp.*, 85 A.D.2d 889, 446 N.Y.S.2d 758, 759 (1981) (citation omitted).

While *Liberty Nat'l* speaks in terms of express contract, not promissory estoppel, there is no significant factual distinction between it and this case. Thus, I must decide whether to follow *Liberty Nat'l.* In making this decision, I am mindful of the fact that cases such as *Liberty Nat'l,* although they are not binding, may be entitled to "special weight" because of "the policy of uniformity in commercial law." *See* 1 J. White & R. Summers *Uniform Commercial Code* § 4 at 10 & n. 45 (3d ed. 1988) (collecting cases). Even though the policy of uniformity is important and facili-

tates inter-state commercial transactions, a court should nonetheless decline to follow a decision of another jurisdiction if it is convinced that the decision is a clear misinterpretation of the UCC. In such a case, a court should be "more concerned that its decision be right under the Code than it be parallel with another state's". *Id.*

I find *Liberty Nat'l* unpersuasive. Without any citation to the UCC, it relies on a pre-UCC case to hold that use of drafts similar to the nine at issue here "invited a payee bank to credit the car dealer's account ... and impliedly promised that defendant would honor the draft...." 446 N.Y.S.2d at 759. As I have suggested in discussing the Bank's negligence claim and its claim on the instruments, this reasoning misapprehends the very nature of a draft and the parties' liability thereon. To hold that a drawee, merely by furnishing such drafts for use by others, impliedly promises to honor and pay the drafts would be inconsistent with the general rule that a drawee is not liable until it accepts a draft. *See* UCC § 3–410(1), Colo.Rev.Stat. § 4–3–410(1) (1973). Common law principles of contract or promissory estoppel cannot supply a basis for relief where those principles are irreconcilable with an express provision of the UCC.

Although there are no reported citations to *Liberty Nat'l*, there is one case involving this very defendant which appears to reject the *Liberty Nat'l* rationale, *Ford Motor Credit Co. v. Exchange Bank & Trust Co.*, 251 Ark. 881, 476 S.W.2d 208 (1972). In *Exchange Bank*, the Supreme Court of Arkansas overturned a jury verdict in favor of plaintiff depositary bank against Ford. The case is similar to the one at bar. Acting pursuant to a financing system like the one described herein, the auto dealer had made out the sight drafts for the amounts of the respective financing contracts, depositing one copy of each sight draft with its depositary bank and mailing one copy to Ford Credit with the financing contracts. Plaintiff depositary bank granted immediate credit to the dealer, based on a telephone call a bank officer made to Ford's regional branch before the bank agreed to give the dealer immediate credit. The dealer deposited the Ford sight drafts

and then encountered financial problems. Plaintiff's theories were estoppel and unjust enrichment, based on UCC § 3–409(2), Ark.Stat.Ann. § 85–3–409(2) (1961). The Arkansas Supreme Court held that the substance of the telephone call, a description of the normal routine followed in the presentation and payment of auto dealer sight drafts, was insufficient evidence to support the jury's estoppel finding that Ford had orally promised to pay the drafts. *Exchange Bank* thus appears to reject *Liberty Nat'l*'s ruling that the face of the drafts clearly created an implied promise to pay; the Arkansas court felt that the evidence of an implied promise to pay was so weak that it even overturned a jury verdict. *See also Galaxy Boat Mfg. Co. v. East End State Bank*, 641 S.W.2d 584, 587 (Tx.App. 1982) (in lawsuit involving defendant drawee bank's alleged wrongful dishonor of check, where customer alleged that drawee bank had orally guaranteed payment of the customer's check, *held* that "no oral acceptance was effective, despite *any form or theory* in which such oral acceptance was alleged") (emphasis added).

The Bank's final argument to support implication of a promise by Ford to honor the nine sight drafts is that the drafts serve no business purpose other than allowing the dealer immediate access to the funds. I do not agree. Even if the Bank had provisionally settled with its customer pending Ford's decision to accept or reject the drafts, as it could have done to protect itself under UCC § 4–212, Colo.Rev.Stat. § 4–4–212 (1973), the drafts still serve the purpose of expediting the entire transaction. Instead of submitting the retail installment sales agreement to Ford, procuring Ford's approval and issuance of a Ford check, awaiting the arrival of Ford's check in the mail, depositing the check with the Bank, and then waiting while the check clears through the Federal Reserve system, a dealer such as Alamosa Motors is permitted, by the use of drafts, to eliminate some of these time-consuming steps by simultaneously mailing the installment sales agreement and depositing the draft. The arrangement is still quicker than alternate systems and advantageous to all parties,

even if the Bank refuses (as it properly may) to give its customer immediate access to the funds represented by the sight drafts until Ford has accepted them.

For the reasons stated herein, plaintiff's motion for summary judgment on its third claim for relief is denied. Defendant's motion for summary judgment on all three claims for relief is granted. The complaint is dismissed, and defendant is awarded its costs.

IT IS SO ORDERED.