# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-3067

_____

Badger Capital, LLC; S. Bradley      *
Daniels,      *
     *
         Plaintiffs - Appellants,      *
     *
Jay Garnett; Karen Garnett,      *
     *
         Plaintiffs,      *
     *
GWE Holdings, LLC; Terry Harper;      *
LR Holdings, LLC; David Mix; Powell      *
Properties, LLC; James Renner; Scott      *
Smith; Arthur Starr; James Stilwell;      *
Laura Stilwell,      *
     *
         Plaintiffs - Appellants,      *
     *    Appeal from the United States
        v.      *    District Court for the
     *    Western District of Arkansas.
Chambers Bank of North Arkansas;      *
Chamber Bancshares, Inc.; John      *
Russell Meeks, Individually and as      *
agent for Chambers Bank or North      *
Arkansas and as agent for Northark      *
Holdings LLC; John Doe, I,      *
Individually and as agent for Chambers      *
Bank or North Arkansas; John Doe, II,      *
Individually and as agent for Chambers      *
Bank or North Arkansas; Growth      *
Group, LLC, Florida; Growth Group,      *
LLC, Arkansas; Edward Davis,      *
Individually and as agent for Growth      *

Group, LLC - Florida and Growth    *
Group, LLC - Arkansas; Rick Hancock,   *
Individually and as agent for Growth   *
Group, LLC - Florida, Growth Group,   *
LLC - Arkansas and Strategic Builders,   *
LLC; Morgan Hooker, Individually and   *
as agent for Growth Group,      *
LLC - Florida, Growth Group,     *
LLC - Arkansas and Strategic Builders,   *
LLC; Mitchell Massey, Individually    *
and as agent for Growth Group,     *
LLC - Florida, Growth Group,     *
LLC - Arkansas, Strategic Builders,    *
LLC and Growth Ventures, LLC;     *
Growth Ventures, LLC; Scott McLain,   *
Individually and as agent for Growth   *
Ventures, LLC and McLain Group,    *
LLC; Dirk Van Veen, Individually and   *
as agent for Growth Ventures, LLC and   *
Zen Holdings, LLC; Heritage Coast    *
Properties, LLC; Bruce Millender,    *
Individually and as agent for Heritage   *
Coast Properties, LLC; Strategic     *
Builders, LLC; McLain Group, LLC;    *
Watering Place, LLC; J. Y. Massey,    *
Individually and as agent for Watering   *
Place, LLC; Zon Holdings, LLC,     *
             *
    Defendants - Appellees,    *
             *
Northark Holdings, LLC,      *
             *
    Defendant.       *

_____

Submitted:  June 14, 2011
Filed:  August 16, 2011
_____

Before BYE and MELLOY, Circuit Judges, and ERICKSEN,[1] District Judge.
_____

MELLOY, Circuit Judge.

Badger Capital, LLC and its co-plaintiffs (collectively referred to as "the Investors") sued Chambers Bank of North Arkansas ("the Bank") for fraudulent concealment.  Specifically, the Investors claimed that the Bank failed to disclose to the Investors certain information regarding a real-estate development.  The district court[2] granted summary judgment in favor of the Bank, finding as a threshold matter that the Bank owed no duty of disclosure to the Investors.  The Investors appeal, and we affirm.

## I. Background

In May of 2005, Mitchell Massey planned a real-estate development in Eastpoint, Florida.  Massey's plan included the construction and sale of 220 residential units on waterfront real estate.  The development—called Eastpoint Landing—was to offer its residents swimming pools and boat access "in a new urban atmosphere."  In furtherance of this plan, Massey formed Eastpoint Redevelopment, LLC ("Eastpoint")

_____

[1] The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota, sitting by designation.

[2] The Honorable Jimm Larry Hendren, Chief Judge, United States District Court for the Western District of Arkansas.

on June 21, 2005, to purchase a roughly seventeen-acre parcel of real estate from Heritage Coast Properties, LLC ("Heritage") for $19 million.

Eastpoint financed the $19 million purchase by obtaining a $14 million loan from the Bank and by raising capital through a private offering to "accredited investors." Eastpoint solicited investors by using a private offering memorandum ("POM"). Under the terms of the POM, Eastpoint offered 10,000 shares of ownership in Eastpoint at a price of $1,000 per share. The offering began on June 20, 2005, and was scheduled to close either when the 10,000 shares were sold or on June 30, 2005. The POM gave Eastpoint the authority to extend the offering period to December 31, 2005, but, under the POM, the offering was "not conditioned upon the sale of any aggregate minimum number of [shares]."

So long as Eastpoint's offering period remained open, the POM provided that "investors' funds [would] be placed in an interest bearing escrow account at Chambers Bank of North Arkansas (the 'Escrow Agent')." Once the offering period closed, "the subscription funds [were to] be transferred by the Escrow Agent to a bank account as designated by [Eastpoint]." The POM's glossary also defined "Escrow Agent" as the Bank. Additionally, a subscription agreement—which the Investors had to complete before purchasing interests in Eastpoint pursuant to the POM—indicated that the Bank would hold the Investors' funds in escrow until Eastpoint either accepted or rejected the subscription. Despite these identifications of the Bank as escrow agent in the POM and subscription agreement, however, the Investors had no verbal or written communication with the Bank regarding their investment in Eastpoint.

As it turned out, one of the investors in Eastpoint was also an employee of the Bank. The employee, J.R. Meeks, received 1,000 shares in Eastpoint on June 27, 2005—one day before Eastpoint closed its real-estate transaction with Heritage and its loan with the Bank on June 28. In exchange for the ownership interest, Meeks executed a $2 million personal guarantee on Eastpoint's loan from the Bank.

-4-

In addition to investing in Eastpoint, Meeks helped Eastpoint acquire its loan from the Bank.[3] Specifically, Meeks was briefed regarding Eastpoint's financial condition prior to Eastpoint's acquisition of the loan, Meeks communicated with the lawyers who prepared the POM, Meeks was present at the June 28 closing, and, Massey stated that Meeks "had worked hard to get the deal done." However, on August 1, 2005—approximately one month after receiving his 1,000 shares of ownership in Eastpoint—Meeks essentially returned the shares in exchange for Massey taking responsibility for Meeks's $2 million personal guarantee.

In the months following Eastpoint's real-estate acquisition, real-estate values in Florida "plummeted." (At least part of the decline appears to have been attributable to damage from multiple hurricanes that struck the Gulf Coast area within sixty days following Eastpoint's real-estate purchase.) Consequently, Eastpoint had difficulty paying its loan from the Bank. Ultimately, the Bank foreclosed on its mortgage in January of 2009. The Bank purchased the property at the foreclosure sale, and, during 2009, the real estate was appraised at a value of $1.69 million.

On June 19, 2008, the Investors filed an action against the Bank, Massey, Meeks, and a number of other entities and individuals who participated in the Eastpoint development. Among other claims,[4] the Investors sued the Bank for

---

[3] The parties dispute what Meeks's official employment position was at the Bank, but there is no dispute that Meeks had an intimate connection with the Bank. He was the nephew of the Bank's president, his mother and two of his aunts sat on the Bank's board of directors, and he was a 0.0002% owner in the Bank.

[4] The Investors also sued the Bank for civil conspiracy, usurious practices, and other equitable relief. The Bank moved for summary judgment on these claims, but the district court denied the Bank's motion. These claims were tried to a jury, and the jury rendered a verdict in favor of the Bank. The Investors do not appeal any aspect of the disposition of these claims.

fraudulent concealment. On January 4, 2010, the Bank moved for summary judgment. The district court granted the Bank's motion, and now the Investors appeal.

## II. Discussion

The Investors argue that the district court erred in granting summary judgment in favor of the Bank on their fraudulent-concealment claim. The Investors argue that they have established a triable issue of fact regarding whether the Bank had a duty to disclose to the Investors certain information regarding Eastpoint's real-estate transaction. According to the Investors, the Bank had a duty to disclose that (1) Eastpoint's private offering had not raised $10 million at the time the offering closed, (2) Eastpoint obtained a loan in addition to its loan from the Bank to pay for some of the costs to close the real-estate purchase with Heritage, and (3) Meeks and an entity operated by Massey's father received equity interests in Eastpoint without making any cash investment.[5]

The district court granted summary judgment in favor of the Bank because it found that the Investors had failed to create a triable issue of fact on the threshold issue regarding whether the Bank owed a duty to disclose to the Investors information regarding their participation in Eastpoint's private offering. We review this decision de novo, "reading the record in a light most favorable to the [Investors] and giving the [Investors] the benefit of all reasonable inferences drawn from the record." Chivers v. Wal-Mart Stores, Inc., 641 F.3d 927, 932 (8th Cir. 2011) (internal quotation marks omitted). "We will affirm if no genuine issue of material fact exists and the [Bank] is entitled to judgment as a matter of law." Id. (internal quotation marks omitted).

---

[5] It is unclear from the Investors' briefs whether this list of allegedly undisclosed facts is exhaustive. Whether this list is exhaustive is irrelevant, however, because we agree with the district court that there is insufficient evidence indicating that the Bank owed a duty to disclose to the Investors information regarding their participation in Eastpoint's private offering.

Under Arkansas law, "when a failure to speak is the equivalent of fraudulent concealment," "the law imposes a duty to speak rather than remain silent." Ward v. Worthen Bank & Trust Co., N.A., 681 S.W.2d 365, 368 (Ark. 1984). "Such a duty of disclosure arises only where special circumstances exist." Union Nat'l Bank of Little Rock v. Farmers Bank, 786 F.2d 881, 887 (8th Cir. 1986) (citing Berkeley Pump Co. v. Reed-Joseph Land Co., 653 S.W.2d 128 (Ark. 1983)). Such "special circumstances" may exist between parties that have a "confidential relationship" when "one party knows another is relying on misinformation to his detriment." Ward, 681 S.W.2d at 368. The Investors argue that they have produced sufficient evidence that "special circumstances" existed in this case which obligated the Bank to disclose the above-referenced facts to the Investors. See Berkeley Pump, 653 S.W.2d at 134 (holding that there must be sufficient evidence regarding the existence of "special circumstances" before the jury may consider the issue).

The Investors first argue that there is sufficient evidence that special circumstances exist because there is sufficient evidence for a jury to find that the Bank served as an escrow agent for Eastpoint's private offering. Arkansas courts have noted that an escrow agent is in a confidential relationship with the other parties to an escrow agreement. Collins v. Heitman, 284 S.W.2d 628, 633 (Ark. 1955). In this case, however, the district court found there to be insufficient evidence that the Bank was an escrow agent because, even though the POM and subscription agreement indicated that Eastpoint and the Investors intended the Bank to be an escrow agent, there was "no evidence" indicating that the Bank had entered into an oral or written escrow agreement or had seen the POM or subscription agreement prior to closing the loan with Eastpoint on June 28, 2005. The Investors do not appear to dispute these findings. The Investors argue, however, that there was evidence indicating that the Bank had implicitly agreed to serve as an escrow agent.

Arkansas courts have noted that even if an entity does not expressly agree to serve as an escrow agent, the entity may be held liable as an escrow agent if the entity

has implicitly "agreed to act as such *and is aware of the terms under which the deposit has been made and the conditions upon which it may be released*." Lasley v. Bank of Ne. Ark., 627 S.W.2d 261, 263 (Ark. Ct. App. 1982) (emphasis added); see also Rosell v. Pulaski Bank & Trust Co., 582 S.W.2d 1, 3 (Ark. 1979) (finding that a bank was estopped from denying that it was holding particular property in escrow because the bank was holding the property in a file that also included a document that appeared to provide for the bank serving as an escrow agent for the property); Smith v. Dixon, 386 S.W.2d 244, 246 (Ark. 1965) (finding sufficient evidence that a bank agreed to serve as an escrow agent because a contract designating the bank as an escrow agent had been delivered to the bank and the bank had "knowledge of the escrow provisions" while holding the property that allegedly was in escrow). Thus, even though there is no evidence indicating that the Bank expressly agreed to serve as an escrow agent, the Bank could be held liable as an escrow agent if the Bank saw the POM or subscription agreement prior to receiving the Investors' subscription funds.

In this case, however, there is insufficient evidence indicating that the Bank saw the POM or subscription agreement prior to receiving the Investors' subscription funds. As noted above, the Investors do not dispute the district court's finding that there is no evidence that the Bank viewed these documents until June 28, 2005. (The Investors argue that Meeks signed a subscription agreement and thus bound the Bank to serve as an escrow agent, but the Investors have not included a copy of this signed agreement in the record.[6]) Meanwhile, the Investors alleged in their complaint that

---

[6] Although Meeks's attorney stated at oral argument that Meeks testified at trial that he signed the subscription agreement, Meeks's attorney is not representing the Bank, this trial took place after the district court's grant of summary judgment on the Investors' fraudulent-concealment claim, and the Investors failed to make the trial transcript part of the record. Even if the Investors had produced a copy of the subscription agreement signed by Meeks, however, we decline to address whether this evidence would create a triable issue of fact regarding whether the Bank agreed to serve as an escrow agent, especially because it is unclear whether Meeks allegedly signed a copy of the agreement before or after the Investors wired their funds to the Bank.

they wired their funds to the Bank from June 23 to June 28. Thus, the undisputed facts indicate that by the time the Bank may have seen the POM or subscription agreement, the Investors had already wired their funds to the Bank. Consequently, the evidence does not indicate that the Bank was aware of the terms of the POM or subscription agreement when the deposits were made. Based on the record, therefore, we agree with the district court that there was insufficient evidence for a jury to find that the Bank served as an escrow agent for Eastpoint's private offering. Accordingly, there was insufficient evidence to find that the Bank had a confidential relationship with the Investors that would have given rise to the special circumstances creating disclosure duties for the Bank under Arkansas law.

The Investors argue that even if the Bank and the Investors were not in a confidential relationship, special circumstances still existed in this case which created disclosure duties for the Bank. Arkansas courts have noted that a confidential relationship may not be necessary to create special circumstances for purposes of a fraudulent-concealment claim. See Holiday Inn Franchising, Inc. v. Hotel Assocs., Inc., No. CA 10-21, 2011 WL 657222 (Ark. Ct. App. Feb. 23, 2011) ("The duty to disclose is not limited to confidential or fiduciary relationships . . . ."). However, Arkansas courts appear to require the existence of some type of relationship or contact between the parties before they conclude that special circumstances exist. See, e.g., Camp v. First Fed. Sav. & Loan, 671 S.W.2d 213, 215–16 (Ark. Ct. App. 1984) (finding that a bank owed a duty of disclosure to a purchaser of real estate because, even though the bank was not the seller, there was evidence that the bank had "made its offices available for the conclusion of the transaction" and that the purchaser had "relied considerably upon the integrity of [the bank] throughout the negotiations"); Holiday Inn, 2011 WL 657222 (finding that a hotel franchisor owed a duty of disclosure to a hotel franchisee because the parties had maintained a decades-long, personal relationship in which they would regularly communicate regarding potential business opportunities).

In this case, the Investors point to a number of facts that they claim establish the presence of special circumstances. None of these facts, however, establish that the Bank had any type of contact or relationship with the Investors. Indeed, the Investors concede that they had no oral or written communication with the Bank. Without additional evidence indicating that the Bank and the Investors had some type of relationship or contact with the Investors, we agree with the district court that there is insufficient evidence to find that special circumstances existed in this case.

## III. Conclusion

In sum, the district court properly found there to be insufficient evidence of special circumstances that obligated the Bank to make disclosures to the Investors regarding their investment in Eastpoint. Therefore, we affirm the district court's grant of summary judgment in favor of the Bank on the Investors' fraudulent-concealment claim.

_____